**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

MICHAEL GRANT,

        Plaintiff,

    vs.

COMMONWEALTH EDISON COMPANY,

        Defendant.

Case No. 1:13-cv-08310

Honorable Gary S. Feinerman

---

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT'S MOTION TO DISMISS**

---

Leslie D. Davis
**Drinker Biddle &Reath LLP**
191 North Wacker Drive, Suite 3700
Chicago, IL 60606-1698
Tel: (312) 569-1000
Fax: (312) 569-3000

Seamus C. Duffy
Tara S. Sarosiek
**Drinker Biddle &Reath LLP**
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Tel: (215) 988-2700
Fax: (215) 988-2757

*Counsel for Defendant*
*Commonwealth Edison Company*

February 21, 2014

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

I.     INTRODUCTION ............................................................................................... 1

II.    BACKGROUND ................................................................................................. 3

III.   LEGAL STANDARD ......................................................................................... 4

IV.   ARGUMENT ...................................................................................................... 5

       A.    ComEd Did Not Violate Section 227 Because Plaintiff Consented To Be Called Or Text Messaged On His Wireless Telephone ........................................ 7

       B.    ComEd Did Not Violate Section 227 Because The Text Message At Issue Is Covered By The Emergency Purpose Exemption ............................................ 11

V.    CONCLUSION ................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

<small>**CASES**</small>

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)....................................................................................................4

*Baird v. Sabre, Inc.*,
  No. 13-999 SVW, 2014 WL 320305 (C.D. Cal. Jan. 28, 2014) .............................10

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)....................................................................................................4

*Brooks v. Ross*,
  578 F.3d 574 (7th Cir. 2009) ......................................................................................4

*In re: CCS Commercial LLC*,
  No. 12-8041 (7th Cir. Dec. 17, 2012)........................................................................8

*Greene v. DirecTV, Inc.*,
  No. 10 C 117, 2010 U.S. Dist. LEXIS 118270 (N.D. Ill. Nov. 8, 2010)...................9

*Gulf Coast Collection Bureau, Inc. v Mais*,
  No. 13-90017 (11th Cir. Sept. 4, 2013) ......................................................................8

*Hanley v. Green Tree Servicing, LLC*,
  934 F. Supp. 2d 977 (N.D. Ill. 2013) .........................................................................7

*Kolinek v. Walgreen Co.*,
  No. 13-4806, 2014 WL 518174 (N.D. Ill. Feb. 10, 2014) .........................................8

*Mais v. Gulf Coast Collection Bureau, Inc.*,
  944 F. Supp. 2d 1226 (S.D. Fla. 2013) .......................................................................8

*Martin v. Comcast*,
  No. 12 C 6421, 2013 WL 6229934 (N.D. Ill. Nov. 26, 2013)...................................9

*Merlo v. Pub. Serv. Co. of N. Ill.*,
  45 N.E.2d 665 (Ill. 1942) ...........................................................................................5

*Mims v. Arrow Fin. Servs., LLC*,
  132 S. Ct. 740 (2012)..................................................................................................5

*Pinkard v. Wal-Mart Stores, Inc.*,
  No 12-02902, 2012 WL 5511039 (N.D. Ala. Nov. 9, 2012).........................9, 10, 11

*Roberts v. Paypal, Inc.*,
　　No. C 12-0622, 2013 U.S. Dist. LEXIS 76319 (N.D. Cal. May 30, 2013) ...........................10

*Ryabyshchuck v. Citibank (S.D.) N.A.*,
　　11-CV-1236, 2012 WL 5379143 (S.D. Cal. Oct. 30, 2012) .....................................................9

*Satterfield v. Simon & Schuster, Inc.*,
　　569 F.3d 946 (9th Cir. 2009) .................................................................................................8

*Saunders v. NCO Fin. Sys.*,
　　910 F. Supp. 2d 464 (E.D.N.Y. 2012) ...................................................................................9

*Thrasher-Lyon v. CCS Commercial LLC*,
　　No. 11-4473, 2012 WL 3835089 (N.D. Ill. Sept. 4, 2012) .....................................................8

*Thrasher-Lyon v. CCS Commercial, LLC*,
　　No. 11 c 4473, 2012 U.S. Dist. LEXIS 157230 (N.D. Ill. Nov. 2, 2012) ................................8

*Thrasher-Lyon v. CCS Commercial LLC*,
　　No. 12-3891 (7th Cir. June 18, 2013) ....................................................................................8

**STATUTES, RULES & REGULATIONS**

47 C.F.R. § 64.1200 ..........................................................................................................7, 12

47 U.S.C. § 227 .............................................................................................................3, 7, 12

Fed. R. Civ. P. 8 ....................................................................................................................4

Fed. R. Civ. P. 12 ..................................................................................................................4

Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227(b)(1)(A)......................1

**LEGISLATIVE AUTHORITIES**

137 Cong. Rec. H. 11307-01 (Nov. 26, 1991) .......................................................................12

137 Cong. Rec. S18781-01 (Nov. 27, 1991) .........................................................................13

H.R. Rep. No. 102-317 (1991) ...........................................................................................5, 7

S. Rep. No. 102-178 (1991) ...................................................................................................5

**REGULATORY AUTHORITIES**

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
　　7 FCC Rcd. 8752 (Oct. 16, 1992) .............................................................................. *passim*

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014 (Jul. 3, 2003) .......................................................................................8

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 FCC Rcd. 559 (Jan. 4, 2008)...............................................................................................7

**OTHER AUTHORITIES**

Anchor Mobile Blog, *SMS Marketing Statistics 2012* (Nov. 11, 2012), *available at* http://marketing.anchormobile.net/blog/bid/178560/SMS-Marketing-Statistics-2012 ............6

FEMA, *Twitter Post Regarding Hurricane Sandy* (Oct. 29, 2012), *available at* http://techcrunch.com/2012/10/29/fema-avoid-wireless-calls-use-text-messages-and-social-networks-to-reduce-network-strain/ ....................................................................................6

Mobile Marketing Association, *U.S. Consumer Best Practices for Messaging* (v. 7.0 Oct. 16, 2012), § 1.4-9, *available at* http://mmaglobal.com/bestpractices.pdf ..............................14

Pew Research Center, *Cell Phone Activities 2019* (Sept. 16, 2013), *available at* http://pewinternet.org/Reports/2013/Cell-Activities.aspx ..........................................................6

*Privacy Policy*, *available at* https://www.comed.com/Pages/privacy-policy.aspx ......................11

*Tips for Communicating in an Emergency*, *available at* http://www.fcc.gov/guides/tips-communicating-emergency...........................................................................................................6

Defendant Commonwealth Edison Company ("ComEd") submits this memorandum in support of its Motion to Dismiss the claims of Plaintiff Michael Grant ("Plaintiff") pursuant to Federal Rule of Civil Procedure 12(b)(6).

## I.  **INTRODUCTION**

ComEd is a power utility company serving approximately 3.8 million customers across Northern Illinois.  With the wave in recent years of extreme weather conditions across the country leading to mass, prolonged power outages, ComEd has sought to improve the speed and efficiency of its communications with its customers, particularly those concerning power outages, by using emerging communications technologies.  On November 7, 2013, Plaintiff alleges that he received a text message from ComEd to his wireless phone introducing him to ComEd's Power Outage Alert Program (the "Program"), a two-way text messaging program designed to provide ComEd customers with the ability to both report power outages to ComEd by text and to receive from ComEd by text both power outage and restoration information.

As alleged in the Complaint, this Program had been offered for some time to ComEd customers on an opt-in basis on ComEd's website.  In the fall of 2013, and in advance of what has turned out to be an unprecedented winter storm season, ComEd rolled the Program out as part of ComEd's standard electric service to all of its customers who provided cell phone numbers as a point of contact.  The text message Mr. Grant received that is the subject of this case provided simple instructions on how to "unsubscribe" to the Program, which Plaintiff did a few hours after receiving the text.  Plaintiff asserts that this single text message violated the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227(b)(1)(A), because, he alleges, he never consented to receive that text message because he never affirmatively "opted in" to the Program during the period the Program was offered on that basis.

His claim should be dismissed for two reasons. First, Plaintiff consented to receive the text message at issue by providing his cell phone number as his primary point of contact. The Federal Communications Commission ("FCC") has made plain that, where a person provides his wireless number as a point of contact in a business relationship (as Plaintiff did here), he consents to receive calls relating to the business relationship, including text messages, at that number. Here, the communications at issue related directly to Plaintiff's electric power service. Plaintiff's repeated allegation that he did not "opt in" to the Program or consent specifically to "text messages sent on behalf of ComEd" does not vitiate the consent he provided by giving his cell phone number to ComEd as his primary point of contact.

Second, the text message at issue falls squarely within the emergency purpose exemption under the TCPA. Not surprisingly, Congress provided an exemption in the TCPA for emergency communications like the kind at issue in this case. It did so, as discussed below, because it did not want the TCPA to chill the use of telecommunications technologies for public health and safety purposes. Indeed, both Congress and the FCC specifically and expressly referenced outage-related automated calls from power companies as communications that would fall within the emergency purpose exemption. It appears that Plaintiff does not even dispute this basic proposition. *See* Compl. ¶ 24. Rather, he takes issue with the text message he received alerting him to the existence of the Program and the means to learn more information about the Program, or to opt out. *Id*. ¶ 21. As discussed below, this initial message falls within the exemption because it was a necessary first step both to make customers aware of the means of future communication and to prevent customer confusion as to future outage-related texts. Importantly, this text also provided customers who had previously given their consent to receive calls on their cell phone the opportunity to "opt out" of further texts under the Program.

Accordingly, whether by virtue of the emergency purpose exemption or the fact that Plaintiff consented to receive the text message at issue, Plaintiff has failed to state a claim under the TCPA and his Complaint should be dismissed.

## II.    BACKGROUND

Plaintiff alleges that ComEd created the Program "in or around January 2012" in order to provide current customers with "text messages regarding power outages in their area." *Id.* ¶¶ 15-16.  The Program enables customers to opt-in by verifying information they had previously provided to ComEd – "either their ComEd account number, social security number, or phone number associated with their ComEd account . . . ." *Id.* ¶ 18.  Plaintiff alleges that he is a current ComEd customer, and claims that although he did not opt-in to the Program, "on or around November 7, 2013," he received the following text message on his wireless phone from Agent511 on behalf of ComEd:

> You are now subscribed to ComEd outage alerts.  Up to 21 msgs/mo.  Visit ComEd.com/text for details.  T&C:agent511.com/tandc.  STOP to unsubscribe. HELP for info.

Compl. ¶¶ 1, 6, 20-22 & n.3.  Plaintiff nowhere alleges that the Program violates the TCPA *in toto*.  Rather, Plaintiff attempts to segregate out a single text message from a broader program, and alleges in conclusory fashion that this text, taken in isolation and out of context, "w[as] not sent for emergency purposes," but rather to "maximize subscriber satisfaction." *Id.* ¶¶ 24-25 (citation omitted).  Plaintiff also does not allege that he ever told ComEd that he did not wish to receive communications at the cell phone number he associated with his account.  Rather, he alleges simply and repeatedly that he "never enrolled in the Outage Alert program and never consented to receive text messages sent from or on behalf of ComEd." *Id.* ¶ 23.

Plaintiff alleges that ComEd violated 47 U.S.C. § 227(b)(1)(A)(iii) of the TCPA by using automated equipment to send the Program texts to customers' cell phones without their prior

express consent. *Id.* ¶ 37. Plaintiff asserts his claims on behalf of a putative class of all persons in the United States who received the same text Plaintiff alleges he received on November 7, 2013 "without providing their prior express consent," and seeks an injunction, attorneys' fees, and a trebling of the $500 statutory damages if the Court finds that the conduct at issue was "willful and knowing." *Id.* ¶¶ 27, 38. ComEd sent the subject text to approximately 1.2 million customers, so the Complaint seeks statutory damages in the aggregate between $600 million and $1.8 billion. All of this for a text message that alerted consenting customers to an innovative new outage alert program, and provided easy instructions on how to opt out.

### III.   LEGAL STANDARD

The Federal Rules of Civil Procedure require that complaints "show[] that the pleader is entitled to relief," and that courts dismiss complaints that "fail[] to state a claim upon which relief can be granted." Fed. R. Civ. P. 8(a)(2), 12(b)(6).

In reviewing a motion pursuant to Rule 12(b)(6), courts must accept well-pleaded facts as true and view them in the light most favorable to the plaintiff. It is not enough, however, to offer a short and plain statement that merely recites the elements of a claim. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). Rather, a plaintiff must "provide the 'grounds' of his 'entitle[ment] to relief,'" which "requires more than labels and conclusions" and "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citation omitted). In other words, the allegations "must be enough to raise a right to relief above the speculative level" and "nudge" the claims "across the line from conceivable to plausible." *Id*. at 555, 570. The Seventh Circuit has interpreted *Iqbal* as "admonishing those plaintiffs who merely parrot the statutory language of the claims that they are pleading . . ., rather than providing some specific facts to ground those legal claims, that they must do more." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

4

Here, even accepting as true Plaintiff's allegation that he never affirmatively enrolled in the Program or opted in to receiving text message communications in particular, his claim must be dismissed because his consent was clear under the governing standard and, in any event, the communication at issue is protected by the emergency purpose exemption.

## IV.    ARGUMENT

In 1991, Congress passed the TCPA to address growing concerns regarding the number of unrestricted telemarketing calls. Finding that these calls "can be an intrusive invasion of privacy," H.R. Rep. No. 102-317, at *2 (1991), Congress intended to "protect the privacy interests of . . . telephone subscribers by placing restrictions on unsolicited, automated telephone calls . . . ." S. Rep. No. 102-178, at 1968 (1991). This case, however, is not about telemarketing calls. Plaintiff does not allege, nor could he, that ComEd sent automated mass text messages indiscriminately in order to advertise its services to potential customers. Instead, Plaintiff challenges an *informational* text message which alerted *current customers*, who had *voluntarily provided* their cell phone numbers, to the Emergency Outage Program and offered them an opportunity to *opt-out*.

Indeed a far cry from the "intrusive, nuisance calls" that the TCPA seeks to restrict, *Mims v. Arrow Financial Services, LLC*, 132 S. Ct. 740, 744 (2012), Plaintiff's claims attack a beneficial program that does nothing but advance public safety by providing an efficient two-way means of delivering emergency power outage-related information. "Electricity [is] a necessity." *Merlo v. Pub. Serv. Co. of N. Ill.*, 45 N.E.2d 665, 673 (Ill. 1942). ComEd's Program serves the public interest not only by keeping the public informed of critical updates regarding power (and providing customers the ability to report outages), but by communicating such information by a distinctly efficient and effective means. 91% of American adults own a cell

phone and 81% of those users communicate via text message.[1]  Research suggests that between 95% and 98% of all text messages are read within minutes of receipt.[2]  By sending its outage alerts via text message, ComEd is harnessing today's advances in mobile technology to reach as many customers as quickly as possible with important, potentially life-saving information.  This is exactly the sort of forward-thinking approach to emergency communication that federal agencies like the FCC and FEMA encourage.  *See, e.g.*, FCC, *Tips for Communicating in an Emergency*, *available at* http://www.fcc.gov/guides/tips-communicating-emergency ("Try text messaging, also known as short messaging service (SMS) when using your wireless phone.  In many cases text messages will go through when your call may not.  It will also help free up more "space" for emergency communications on the telephone network."); FEMA, *Twitter Post Regarding Hurricane Sandy* (Oct. 29, 2012), *available at* http://techcrunch.com/2012/10/29/fema-avoid-wireless-calls-use-text-messages-and-social-networks-to-reduce-network-strain/ ("Phone lines may be congested during/after #Sandy.  Let loved ones know you're OK by sending a text . . .").[3]

Fortunately for the millions of ComEd customers helped by the outage alert text messages, Plaintiff's claim is barred because, as the FCC has stated plainly, outage-related communications by power companies are "***within either the broad exemption for emergency calls, or the exemption for calls to which the called party has given prior express consent***."

*See In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 7

---

[1]    *See* Pew Research Center, *Cell Phone Activities 2019* (Sept. 16, 2013), *available at* http://pewinternet.org/Reports/2013/Cell-Activities.aspx.

[2]    *See* Anchor Mobile Blog, *SMS Marketing Statistics 2012* (Nov. 11, 2012), *available at* http://marketing.anchormobile.net/blog/bid/178560/SMS-Marketing-Statistics-2012.

[3]    Indeed, catastrophic storms like Sandy and Katrina have focused attention on providing timely information regarding power outages to the public.  As ComEd acknowledged through development of its Program, widespread, immediate and effective communication is key to enhancing public safety in regional public emergencies.

FCC Rcd. 8752, 8777-78 (Oct. 16, 1992) ("1992 TCPA Order"). We begin with a discussion of the consent exemption.

### A.    ComEd Did Not Violate Section 227 Because Plaintiff Consented To Be Called Or Text Messaged On His Wireless Telephone

Plaintiff's claim under Section 227(b)(1)(A)(iii) should be dismissed because Plaintiff consented to be called on his wireless telephone. Under the TCPA, it is unlawful:

> [T]o make any call (other than a call made for emergency purposes *or made with the prior express consent of the called party*) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone . . . .

47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added). To state a claim under Section 227(b)(1)(A)(iii), a plaintiff must establish that: (1) a call was made; (2) the caller used an ATDS or artificial or prerecorded voice; (3) the telephone number called was assigned to a cellular telephone service; and (4) the caller did not have prior express consent of the recipient. *Id.*; 47 C.F.R. § 64.1200(a)(1); *Hanley v. Green Tree Servicing, LLC*, 934 F. Supp. 2d 977, 982 (N.D. Ill. 2013) (granting motion to dismiss where plaintiff failed to plead a plausible entitlement to relief that defendant lacked consent to call his cell phone).

In interpreting "prior express consent," the FCC has held that any "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given," and that companies "will not violate [FCC] rules by calling a number which was provided as one at which the called party wishes to be reached." 1992 TCPA Order, 7 FCC Rcd. at 8769. The FCC found in the legislative history of the TCPA, in particular in a House Report that stated that "[t]he restriction on calls to emergency lines, pagers, and the like does not apply when the called party has provided the telephone number of such a line to the caller for use in normal business communications." H.R. Rep. No. 102-317, at *17; *see also In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of*

*1991*, 23 FCC Rcd. 559, 564 (Jan. 4, 2008) ("We conclude that the provision of a cell phone number to a creditor, *e.g.*, as part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt."). The FCC has interpreted "call" to encompass both voice calls and text messages to wireless numbers. *See In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 (Jul. 3, 2003); *see also Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009).

The overwhelming majority of courts have followed the FCC's interpretation of "prior express consent," holding when a customer provides a company with his cell phone number, he consents broadly to receive calls at that number.[4] *See, e.g., Kolinek v. Walgreen Co.*, No. 13-4806, 2014 WL 518174, at *3 (N.D. Ill. Feb. 10, 2014) (granting defendant's motion to dismiss where plaintiff provided his cell phone number to defendant and later began receiving automated robocalls regarding prescription reminders because plaintiff's provision of his number constituted consent and the "complaint d[id] not identify any 'instructions to the contrary' that he

---

[4]     While a few courts have seemingly disregarded the FCC's interpretation and found that consumers do not necessarily consent to receive calls by merely providing their phone number to the caller, these cases involve circumstances where the calls at issue seemed well beyond the scope of any consent provided. *See, e.g., Mais v. Gulf Coast Collection Bureau, Inc.*, 944 F. Supp. 2d 1226, 1241 (S.D. Fla. 2013) (number provided by spouse at emergency room check-in not consent for later debt collection calls associated with hospital charges); *Thrasher-Lyon v. CCS Commercial LLC*, No. 11-4473, 2012 WL 3835089, at *6 (N.D. Ill. Sept. 4, 2012) (number provided at the scene of an accident to police officer and other party involved in the accident not consent for later debt collection calls associated with insurance company's subrogation claim). The reasoning of these cases has no application here – where the communication at issue is squarely within the scope of communications contemplated by the business relationship between the parties. To the extent these cases can be read to reject the FCC's controlling interpretation of the TCPA, they should not be followed. Indeed, the ruling in *Mais* is now on interlocutory appeal to the Eleventh Circuit. *See Mais*, 944 F. Supp. 2d at 1253 (granting leave to petition for leave to appeal); *Gulf Coast Collection Bureau, Inc. v Mais*, No. 13-90017 (11th Cir. Sept. 4, 2013) (order granting leave to file appeal). *See also Thrasher-Lyon v. CCS Commercial, LLC*, No. 11 c 4473, 2012 U.S. Dist. LEXIS 157230, at *4 (N.D. Ill. Nov. 2, 2012) (granting leave to petition for interlocutory appeal); *In re: CCS Commercial LLC*, No. 12-8041 (7th Cir. Dec. 17, 2012) ECF No. 6 (order granting leave to appeal); *Thrasher-Lyon v. CCS Commercial LLC*, No. 12-3891 (7th Cir. June 18, 2013) ECF No. 27 (order dismissing appeal following settlement).

imposed at the time he provided his cell phone number to Walgreens"); *Martin v. Comcast*, No. 12 C 6421, 2013 WL 6229934, at *3 (N.D. Ill. Nov. 26, 2013) (concluding that a person has provided prior express consent under the TCPA if he "gives a cell phone number to a company as part of a business relationship"); *Greene v. DirecTV, Inc.*, No. 10 C 117, 2010 U.S. Dist. LEXIS 118270, at *9 (N.D. Ill. Nov. 8, 2010) (plaintiff gave "prior express consent" to receive fraud alert text messages once she listed her cell phone number as the preferred manner to be contacted and placed no conditions on the use of her number); *Saunders v. NCO Fin. Sys.*, 910 F. Supp. 2d 464, 467-68 (E.D.N.Y. 2012) (debtor expressly consented to defendant contacting him on his cell phone where he listed only his cell phone number on the underlying account); *see also Ryabyshchuck v. Citibank (S.D.) N.A.*, 11-CV-1236, 2012 WL 5379143, at *3 (S.D. Cal. Oct. 30, 2012) (provision of wireless number at the time of submitting an online credit card constituted "prior express consent" to be contacted by defendant regarding the status of his application).

By extension, courts have reasoned that by providing one's cell phone number, a person consents to receive text messages at that number as well. For example, in *Pinkard v. Wal-Mart Stores, Inc.*, No 12-02902, 2012 WL 5511039 (N.D. Ala. Nov. 9, 2012), the plaintiff alleged that when she dropped off a prescription at Wal-Mart, she was asked for her cellular number "in case there were any questions that came up." *Id*. at *2. After receiving text messages with solicitations from Wal-Mart, she filed suit. *Id*. at *6. Wal-Mart moved to dismiss, arguing that under the FCC's ruling, the plaintiff had expressly consented to receive text messages when she voluntarily provided her cell phone number. *Id*. at *3-4. The plaintiff contended that her consent was "limited" because "no one at Wal-Mart mentioned anything about using plaintiff's private information that they were able to get *from her* and then enrolling her into an automated service or program . . . ." *Id*. at *6 (emphasis in original). In rejecting the plaintiff's argument,

9

the court relied on the FCC's 1992 Order and noted that the plaintiff "invert[ed] the burden of proof on the issue. Once she voluntarily provided defendant with her telephone number (*i.e.*, generally consented), it was *her* responsibility to *explicitly* state the limited scope of her consent.") *Id*. at *7 (emphasis in original). *See also Baird v. Sabre, Inc.*, No. 13-999 SVW, 2014 WL 320305, at *6 (C.D. Cal. Jan. 28, 2014) (finding plaintiff who voluntarily provided a cell phone number to an airline in order to complete an online booking gave "prior express consent" to receive a text message inviting plaintiff to receive flight notification services from the airline's vendor); *Roberts v. Paypal, Inc.*, No. C 12-0622, 2013 U.S. Dist. LEXIS 76319, at *14 (N.D. Cal. May 30, 2013) (finding plaintiff "consented to receive text messages from Paypal simply by providing his cell phone number . . . .").

Here, Plaintiff provided his consent when he voluntarily gave his wireless number to ComEd as his primary contact information in establishing an account to receive electric power service. Through artful pleading, Plaintiff attempts to obscure this detail by focusing the Court's attention instead on the irrelevant allegation that he didn't "opt-in" to the Program when it was offered on that basis prior to being rolled out to customers who had consented to receive communications to their cell phones. On this ground alone, Plaintiff repeatedly alleges that he "never consented to receive text messages" from ComEd. Compl. ¶ 23.

But the FCC's governing interpretation of the TCPA does not require any specific "opt in" to text messages. What is required is that a person "knowingly release [his] phone number[]" to a business "as one at which [he] wishes to be reached." 1992 TCPA Order 7 FCC Rcd. at 8769. The fact that ComEd offered the Program initially on an "opt in" basis, and that Plaintiff did not subscribe to the Program during this period, does not negate the consent the Plaintiff gave to ComEd to communicate with him in the normal course of business concerning his

10

electric services.[5]  Significantly, Plaintiff *never* states that he did not voluntarily furnish ComEd with his wireless number, nor does he allege that ComEd improperly obtained his cell phone number.  Plaintiff also *never* states that he limited the scope of his consent.  *See Pinkard*, 2012 WL 5511039, at *7.

Accordingly, and based on the consent inherent in these customers' provision of their cell phone numbers as a point of contact, ComEd was well within its rights under the TCPA to, as Plaintiff puts it, "unilaterally enroll" these customers in the Program.  For this reason, Plaintiff cannot state a claim against ComEd under the TCPA and his Complaint should be dismissed.

**B.**     **<u>ComEd Did Not Violate Section 227 Because The Text Message At Issue Is Covered By The Emergency Purpose Exemption</u>**

The Complaint should be dismissed also because the text message at issue is squarely covered by the emergency purpose exemption under the TCPA.

Although the TCPA generally prohibits the use of an automatic dialer or an artificial or prerecorded voice to initiate any call, including text messages, to any wireless phone, pager or other mobile and/or radio device, calls or text messages made for "emergency purposes" are exempt.  Specifically, the TCPA provides as follows:

---

[5]      Indeed, ComEd's Privacy Policy on its website, which plaintiff references in his complaint, expressly provides as follows:

> When you submit personal information to us, you are agreeing to permit us and our subsidiaries and affiliates to access, store, and use the information wherever in the world we and our subsidiaries and affiliates do business, both inside and outside the United States.  However, BGE, ComEd and PECO will share customer information with their affiliates only to the extent permitted by applicable law and regulation.  ***In particular, we may use your personal information*** for various business purposes, such as statistical analyses, generating surveys, doing market research, improving its services, and ***notifying you about services and changes that may affect you***, among other business purposes.

ComEd, *Privacy Policy*, *available at*  https://www.comed.com/Pages/privacy-policy.aspx  (emphasis added).

> It shall be unlawful . . . to make any call (***other than a call made for emergency purposes*** or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . .cellular telephone . . . .

47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added).

Congress conferred upon the FCC the authority to interpret, implement, and enforce the TCPA in agency rules, orders and in binding interpretations of the statute. *See* 47 U.S.C. § 227(b)(2). Pursuant to that authority, the FCC defines emergency purpose calls in its rules as "calls made necessary in any situation affecting the health and safety of consumers." 47 C.F.R. § 64.1200(f)(4). The FCC also has ruled that the emergency purpose exemption is meant to be a "broad exemption." 1992 TCPA Order, 7 FCC Rcd. at 8778.

Indeed, both Congress (when it was enacting the TCPA) and the FCC (in issuing implementing rulings and orders on the scope of the TCPA, as well as the scope of TCPA exemptions) specifically and repeatedly discussed automated calls (and by extension texts) from power companies as communications that fall within the emergency purpose exemption. For example, during the Congressional proceedings and debates on the TCPA, Congressman Edward J. Markey, Chair of the House Telecommunications and Finance Subcommittee and a sponsor of the TCPA, explained that "the term 'emergency purposes' [was] . . . intended to include any automated telephone call that notifies consumers of impending or current power outages, whether these outages are for scheduled maintenance, unscheduled outages caused by storms, or power interruptions for load management programs." 137 Cong. Rec. H. 11307-01, *H11310 (Nov. 26, 1991). Senator Ernest F. Hollings, Chair of the Senate Committee on Commerce, Science and Transportation, and a sponsor of the TCPA, also explained that:

> In defining this term the FCC could find that 'emergency purpose' includes any automated telephone call that notifies consumers of impending or current power outages, whether these outages are for scheduled maintenance, unscheduled outages caused by storms or similar circumstances, cut off power due to late

> payment of bills, power interruptions for load management programs, or other reasons. Power interruptions can be detrimental to the public health and safety. Therefore, the FCC should consider whether all or certain types of outages should be considered an emergency.

137 Cong. Rec. S18781-01, *S18784 (Nov. 27, 1991).

In its implementation rulemaking after Congress passed the TCPA, the FCC explicitly determined that pre-recorded calls that alert utility customers to "service outages, to warn customers of discontinuance of service, [ ] to read meters for billing purposes . . . [and] to contact a party designated by the customer in the event that a delinquent bill or a service outage threatens interruption of that customer's service" were "within either the broad exemption for emergency calls, or the exemption for calls to which the called party has given prior express consent." 1992 TCPA Order, 7 FCC Rcd. at 8777-78. With the advent of ever more functional and personal communications devices, the ability of critical infrastructure companies to communicate with customers in real time about developing threats to property and people has increased, and the FCC encourages these forms of communication as promoting public safety. *See id.* at 8778 ("Service outages and interruptions in the supply of . . . electricity could in many instances pose significant risks to public health and safety, and the use of prerecorded message calls could speed the dissemination of information regarding service interruptions or other potentially hazardous conditions to the public."); *see also* FCC Report and Order, dated Feb. 15, 2012 ¶¶ 3, 17 (recognizing that the recent amendments to the FCC rules requiring prior express written consent "do not affect messages sent to consumers to alert them to emergency situations" because "TCPA's . . . restrictions do not apply to calls initiated for emergency purposes.").

Here, the Program, through two-way text messaging, enables customers to stay informed regarding power outages and restoration efforts and in fact to provide outage information to ComEd so that restoration can begin more quickly. This is precisely what the FCC and Congress

13

envisioned as emergency purpose communications which are exempt from the TCPA. *See* 1992 TCPA Order, 7 FCC Rcd. at 8777-78. Indeed, there is a compelling public safety imperative to timely alerting the public to power outages and providing restoration information so that customers can take action and protect themselves and their families. The very notion that a text alerting consenting customers to such a program could be the basis for a lawsuit seeking between $600 million and $1.8 billion in statutory damages turns the statute and its purposes upside down.

It is true, as alleged in the Complaint and as discussed above, that ComEd introduced the Program initially on an "opt in" basis. In the fall of 2013, however, ComEd began to include subscription into the Program as part of its standard electric service that it provides to customers on an "opt-out" basis. The Program was therefore rolled out to all customers who had previously provided ComEd with a cell phone number as a point of contact regarding their electric service. The text message at issue in this litigation was a necessary and logical first step in that communication chain.[6] It introduced those customers to the Program and offered each with the opportunity to opt-out,[7] thereby directly serving the emergency purpose of the Program by providing the necessary information to customers as to the means of future communication so that they would be well prepared to receive or originate outage information. Without this introductory text message, customers might well have been unaware of the Program. Such a customer might not only continue to try to contact ComEd during an outage by voice call and

---

[6]     ComEd's introductory text message was consistent with the Mobile Marketing Association's best practices, which instruct that, as part of a recurring messaging program, a "confirmation" message must be sent to subscribers which includes, among other things, opt-out information and instructions. Mobile Marketing Association, *U.S. Consumer Best Practices for Messaging*, (v. 7.0 Oct. 16, 2012), § 1.4-9, *available at* http://mmaglobal.com/bestpractices.pdf.

[7]     Before sending any text messages to these customers, ComEd also sent each of them a letter or email describing the Program and offering an opportunity to opt-out of receiving the outage alerts.

experience long wait times to report or to receive outage information (adding strain to the telephone grid during an emergency), but might also be confused and/or uncertain about the authenticity of outage alerts delivered under the Program. The initial subscription alert Plaintiff challenges was thus an integral part of the overall Program, and was a necessary step in extending the Program to those customers who had previously provided ComEd with their cell phone number as a point of contact. It would be flatly inconsistent with purpose of the TCPA to punish such a text, *which provided consenting customers the option to opt out of further texts under the Program*.

The Program was designed to serve a public safety purpose by streamlining important outage-related communications between ComEd and its customers in a manner well known to text message users. The TCPA's steep statutory damages were not enacted to punish the kinds of public service communications challenged in this case, but rather to curb telemarketing abuse. Plaintiff's effort to extract only the initial text message from the context of the broader Program is a transparent artful pleading device aimed at obscuring the true emergency purpose of the Program. This effort should fail, and Plaintiff's Complaint should be dismissed.

## V. <u>CONCLUSION</u>

The legal principles on which this case should be dismissed were well stated by the FCC in the 1992 Order, where the Commission stated plainly that outage-related communications by power companies are "*within either the broad exemption for emergency calls, or the exemption for calls to which the called party has given prior express consent.*" 1992 TCPA Order, 7 FCC Rcd. at 8777-78 (emphasis added). For all of the foregoing reasons, ComEd respectfully requests that the Court grant its Motion to Dismiss.

15

Dated: February 21, 2014              Respectfully submitted,

/s/ Leslie D. Davis             
Leslie D. Davis (ARDC No. 6229110)
Leslie.Davis@dbr.com
**Drinker Biddle &Reath LLP**
191 North Wacker Drive, Suite 3700
Chicago, IL 60606-1698
Tel:    (312) 569-1000
Fax:    (312) 569-3000

Seamus C. Duffy, *pro hac to be filed*
Tara S. Sarosiek, *pro hac to be filed*
**Drinker Biddle &Reath LLP**
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Tel:    (215) 988-2700
Fax:    (215) 988-2757

*Counsel for Defendant*
Commonwealth Edison Company

<u>**CERTIFICATE OF SERVICE**</u>

I, Leslie D. Davis, hereby certify that, on the date set forth above, I caused a true and correct copy of the foregoing *Motion to Dismiss and Memorandum in Support* to be served via ECF filing upon the following parties and counsel of record:

Jay Edelson
Ari J. Scharg
EDELSON LLC
350 North LaSalle Street, Suite 1300
Chicago, IL 60654

/s/ Leslie D. Davis