**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| MICHAEL GRANT, individually and on behalf of all others similarly situated, | Case No. 1:13-cv-8310 |
| *Plaintiff*, | |
| | Hon. Gary Feinerman |
| *v.* | |
| COMMONWEALTH EDISON COMPANY, an Illinois corporation, | |
| *Defendant*. | |

**PLAINTIFF'S MOTION FOR LEAVE TO FILE MOTION AND MEMORANDUM OF
LAW IN SUPPORT OF APPROVAL OF ATTORNEYS' FEES, EXPENSES, AND
<u>INCENTIVE AWARD WITH EXCESS PAGES, *INSTANTER*</u>**

Pursuant to Local Rule 7.1, Plaintiff Michael Grant ("Plaintiff" or "Grant") hereby respectfully requests that the Court grant him leave to file a memorandum in support of his Motion for Approval of Attorneys' Fees, Expenses, and Incentive Award in excess of the Court's fifteen-page (15) limit, *instanter*. In support of this motion, Grant states as follows:

1. On April 30, 2015, the Court granted preliminary approval of the Parties' proposed class action settlement (the "Preliminary Approval Order"). (Dkt. 57.)

2. Pursuant to the Court's Preliminary Approval Order, Grant was required to file his Motion for Attorneys' Fees, Expenses, and Incentive Award on or before July 23, 2015. (*Id.*)

3. In order to adequately address the appropriateness of the requested attorneys' fee and incentive awards, particularly in light of other similar settlements and the nature of the instant litigation and settlement, Grant's Memorandum of Law in Support of his Motion for Approval of Attorneys' Fees, Expenses, and Incentive Award (the "Memorandum") exceeds the Court's fifteen-page limit.

4. Specifically, Grant's Memorandum includes a total of 21 pages of substance.

5.      Good cause exists to grant the instant motion and the relief requested herein is not sought for any improper purpose.

6.      Attached hereto as Exhibit A is a true and accurate copy of Plaintiff's Motion and Memorandum of Law in Support of Approval of Attorneys' Fees, Expenses, and Incentive Award.

**WHEREFORE,** Plaintiff Michael Grant respectfully requests that the Court enter an Order (i) granting him leave to file his Memorandum of Law in Support of Motion for Approval of Attorneys' Fees, Expenses, and Incentive Award, the substance of which shall not exceed twenty-one (21) pages, *instanter*, and (ii) providing such other and further relief as the Court deems reasonable and just.

Respectfully submitted,

**MICHAEL GRANT**, individually and on behalf of all others similarly situated,

Dated: July 23, 2015                    By:  ___/s/  John C. Ochoa_____
                                                 One of Plaintiff's Attorneys

Jay Edelson
jedelson@edelson.com
Rafey S. Balabanian
rbalabanian@edelson.com
Ari J. Scharg
ascharg@edelson.com
John C. Ochoa
jochoa@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

## CERTIFICATE OF SERVICE

I,  John C. Ochoa, an attorney, hereby certify that on July 23, 2015, I served the above and foregoing *Plaintiff's Motion for Leave to File Memorandum in Support of Motion for Approval of Attorneys' Fees, Expenses, and Incentive Award with Excess Pages, Instanter*, by causing a true and accurate copy of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system, on this the 23rd day of July 2015.

/s/  John C. Ochoa

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MICHAEL GRANT, individually and on behalf of all others similarly situated, | Case No. 1:13-cv-8310 |
| *Plaintiff*, | |
| *v.* | Hon. Gary Feinerman |
| COMMONWEALTH EDISON COMPANY, an Illinois corporation, | |
| *Defendant*. | |

**PLAINTIFF'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF
APPROVAL OF ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD**

**Respectfully Submitted by Class Counsel:**

Jay Edelson
jedelson@edelson.com
Rafey S. Balabanian
rbalabanian@edelson.com
Ari J. Scharg
ascharg@edelson.com
John C. Ochoa
jochoa@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

**TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................................1

II.     FACTUAL AND PROCEDURAL BACKGROUND .........................................3

        A.      Nature of the Case ...................................................................................3

        B.      The Litigation and Work Performed for the Class's Benefit .................5

        C.      Mediations with Judge Andersen ...........................................................7

        D.      The Settlement Achieves Strong Relief for the Settlement Class ..........8

III.    CLASS COUNSEL'S REQUESTED ATTORNEYS' FEE AND EXPENSE AWARD IS
        REASONABLE, FALLS WITHIN THE MARKET RATE FOR SIMILAR SERVICES
        AND THUS, SHOULD BE APPROVED.......................................................9

        A.      The Base Rate in TCPA Cases Involving Similar Settlement Amounts—Before
                Taking Risk into Account—Is 30% ...................................................11

                1.      Class Counsel's contingency agreement with Plaintiff is 33% of any sum
                        recovered ...............................................................................11

                2.      Similar TCPA cases confirm that the base rate for fee awards
                        based on a percentage of the recovery analysis is 30%—excluding
                        a risk adjustment—for the first $10 million recovered ...........12

        B.      The Risk Associated with the Litigation Justifies a Fee Award in Excess of 36%
                of the Net Benefit to the Settlement Class and Certainly One Third of the Total
                Settlement Fund, which Is a Slightly Lesser Amount .........................14

                1.      The issues in this case show that Class Counsel faced substantial risk ......15

                2.      This case presented far greater risk than most other TCPA cases .............17

                3.      The Settlement provides a greater benefit than settlements
                        in similar cases .........................................................................19

IV.     PLAINTIFF'S REQUEST FOR $5,000 REPRESENTS A FAIR AND REASONABLE
        INCENTIVE AWARD......................................................................................20

V.      CONCLUSION ...............................................................................................21

## TABLE OF AUTHORITIES

**UNITED STATES SUPREME COURT CASES**

*Mims v. Arrow Fin. Servs. LLC,*
    132 S. Ct. 740 (2012) ..................................................................................................... 3

**UNITED STATES CIRCUIT COURT OF APPEALS CASES**

*Americana Art China, Co., Inc. v. Foxfire Printing & Packaging, Inc.,*
    743 F.3d 243 (7th Cir. 2014) ........................................................................................ 10

*Cook v. Niedert,*
    142 F.3d 1004 (7th Cir. 1998) ......................................................................... 10, 12, 20

*In re Continental Illinois Securities Litigation,*
    962 F.2d 566 (7th Cir. 1992) ........................................................................................ 14

*In re Synthroid Mktg. Litig.,*
    264 F.3d 712 (7th Cir. 2001) ................................................................................ *passim*

*In re Synthroid Mktg. Litig.,*
    325 F.3d 974 (7th Cir. 2003) ........................................................................................ 13

*In re Trans Union Corp. Privacy Litig.,*
    629 F.3d 741 (7th Cir. 2011) ............................................................................... 9, 14, 15

*Kirchoff v. Flynn,*
    786 F.2d 320 (7th Cir. 1986) ........................................................................................ 10

*Redman v. RadioShack Corp.,*
    768 F.3d 622 (7th Cir. 2014) .................................................................................... 13-14

*Satterfield v. Simon & Schuster, Inc. et al.,*
    569 F.3d 946 (9th Cir. 2009) .................................................................................... 3, 19

*Silverman v. Motorola Solutions, Inc.,*
    739 F.3d 956 (7th Cir. 2013) ........................................................................................ 15

*Sutton v. Bernard,*
    504 F.3d 688 (7th Cir. 2007) .......................................................................................... 9

## UNITED STATES DISTRICT COURT CASES

*Craftwood Lumber Co. v. Interline Brands*,
    2015 WL 2147679 (N.D. Ill. May 6, 2015)................................................................13, 18

*Greene v. DirecTV*,
    2010 WL 4628734 (N.D. Ill. Nov. 8, 2010) ...............................................................16

*In re Capital One Tel. Consumer Prot. Act. Litig.*,
    2015 WL 605203 (N.D. Ill. Feb. 12, 2015)...........................................................*passim*

*In re Jiffy Lube Int'l, Inc. Text Spam Litig.*,
    No. 11-md-2261 (S.D. Cal. 2013) ..............................................................................2, 19

*Kaplan v. Houlihan Smith & Co.*,
    2014 WL 2808801 (N.D. Ill. June 20, 2014)................................................................11

*Kazemi v. Payless Shoesource, Inc.*,
    No. 09-cv-5142 (N.D. Cal. 2012)..............................................................................2, 19

*Kolinek v. Walgreen Co.*,
    2014 WL 3056813 (N.D. Ill. July 7, 2014) ..................................................................16

*Kramer v. Autobytel, Inc.*,
    No. 10-cv-2722 (N.D. Cal. 2012)...............................................................................19

*Lozano v. Twentieth Century Fox Film Corp.*,
    702 F. Supp. 2d 999 (N.D. Ill. 2011)........................................................................3, 19

*McKinnie v. JP Morgan Chase Bank, N.A.*,
    678 F. Supp. 2d 806 (E.D. Wis. 2009) ...................................................................12-13

*Roberts v. Paypal, Inc.*,
    2013 WL 2384242 (N.D. Cal. May 30, 2013) ..............................................................16

*Ryabyshchuck v. Citibank (S.D.) N.A.*,
    2012 WL 5379143 (S.D. Cal. Oct. 30, 2012) ..............................................................16

*Weinstein v. The Timberland Co., et al.*,
    No. 06-cv-00484 (N.D. Ill. 2008).................................................................................19

*Wilkins v. HSBC Bank Nevada, N.A.*,
    2015 WL 890566 (N.D. Ill. Feb. 27, 2015)...........................................................*passim*

*Williams v. Gen. Elec. Capital Auto Lease*,
    1995 WL 765266 (N.D. Ill. Dec. 26, 1995) .............................................................10, 12

**STATUTES**

47 U.S.C. § 227 ..................................................................................................................3, 5

28 U.S.C. § 1715 ....................................................................................................................9

**MISCELLANEOUS**

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*,
    7 J. Empirical L. Stud. 811 (2010) .................................................................................12

Theodore Eisenberg & Geoffery P. Miller, *Attorney Fees in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Studies 265 (2010)) .........................................................18

## I.  INTRODUCTION

The Settlement[1] that forms the basis for Plaintiff Michael Grant's ("Plaintiff") request for attorneys' fees, expenses, and incentive award is the result of almost two years of hard-fought litigation, which included briefing on potentially dispositive motions, extensive class and merits discovery, and three mediation sessions—spanning ten months—with the Honorable Wayne R. Andersen (ret.) of JAMS. As explained herein, the Settlement is an exceptional result for the class, both in terms of what the class could have hoped to ultimately recover at trial, and also relative to the relief provided under other class action settlements in cases alleging violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et seq.*

As to the former, Defendant Commonwealth Edison Company ("ComEd") has agreed to create a $4.95 million non-reversionary settlement fund (the "Settlement Fund") from which claiming class members are expected to receive a minimum of $50 in cash. Given ComEd's defenses of prior express consent, and that the text messages fell within the TCPA's emergency purpose exemption—an issue of first impression—the $50 cash payment, representing 10% of the maximum recovery under the TCPA,[2] is a significant recovery for the class on account of their TCPA claims. And that says nothing of the injunctive relief provided under the Settlement, which requires ComEd to provide its employees with TCPA compliance training to ensure the challenged conduct does not occur going forward.  In the end, the relief recovered for the class justifies the fees sought.

With respect to how the Settlement compares with others in the TCPA class action space,

---

[1] The terms "Settlement" and "Settlement Agreement" refer to the Class Action Settlement Agreement filed with this Court on April 28, 2015. (Dkt. 55.)

[2] While the statutory damage award of $500 under the TCPA may be trebled to $1,500 for willful conduct, given the context in which the Text Messages were sent to the class, Plaintiff and Class Counsel believe it is highly unlikely they could obtain a finding of willfulness.

1

the per class member recovery exceeds the typical range of individual payouts to class members in "direct relationship" cases of this sort (i.e., where, like here, there exists a relationship between the parties, such that the recipients of the calls voluntarily provided their cell phone numbers to the caller at some point in time). *See, e.g., Kazemi v. Payless Shoesource, Inc.*, No. 3:09-cv-05142, Dkt. 94 (N.D. Cal. 2012) (providing a $25 voucher to each class member); *In re Jiffy Lube Int'l, Inc. Text Spam Litig.*, No. 3:11-MD-02261, Dkt. 97 (S.D. Cal. 2013) (providing a $20 voucher, which could be redeemed for $15 cash after expiration of nine-month waiting period).

With that as the backdrop, Plaintiff Grant now moves the Court to approve (i) the fee award to Class Counsel in the amount of $1,650,200 (representing approximately one third of the total Settlement Fund or 36% of the net Settlement Fund,[3] i.e., after excluding the costs of notice and administration and the proposed incentive award), and (ii) an incentive award of $5,000 for his service as class representative. Both the requested fee award and incentive award are at or below the amounts approved in similar TCPA class actions, are consistent with the market rates for such awards, fairly compensate counsel for the time and effort expended in the case, and reflect the results achieved for the class and the risks faced by Class Counsel in this litigation. For these reasons, as explained further below, pursuant to Federal Rule of Civil Procedure 23(e), Plaintiff respectfully requests that the Court approve the requested fee award and incentive award.

---

[3] While the Settlement Agreement provides that Class Counsel will seek no more than 36% of the Settlement Fund (i.e., $1,782,000), that figure is simply the upper bound of what Plaintiff could seek under the Settlement. In seeking a total of $1,650,000, Class Counsel is seeking an amount of attorneys' fees consistent with their retainer agreement with Plaintiff Grant. *See infra*, Section III.A.1.

2

## II.  FACTUAL AND PROCEDURAL BACKGROUND

A brief summary of the underlying facts and law involved in the litigation, which lends context to the reasonableness of the requested fee award and incentive award, is outlined below.

### A.  Nature of the Case

Plaintiff filed his putative class action complaint against ComEd on November 19, 2013, asserting a single claim for violations of the TCPA. (Dkt. 1, Plaintiff's Class Action Complaint ["Compl."].) Congress enacted the TCPA more than two decades ago in response to "[v]oluminous consumer complaints about abuses of telephone technology." *Mims v. Arrow Fin. Servs. LLC*, 132 S. Ct. 740, 744 (2012). In so doing, Congress specifically sought to prevent "intrusive nuisance calls" to consumers that it deemed "invasive of privacy," *id.*, and set statutory damages in the amount of $500 per violation in addition to providing for injunctive relief, *see* 47 U.S.C. § 227(b)(3)(A)-(C).

The TCPA specifically prohibits the use of equipment termed an "automatic telephone dialing system" to place calls to cellular phones, providing that:

> It shall be unlawful for any person within the United States…(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system…to any telephone number assigned to any…cellular telephone service…

47 U.S.C. § 227(b)(1)(A)(iii). The TCPA applies to traditional phone calls as well as text message calls. *Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999, 1005 (N.D. Ill. 2010); *see also Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009). As defenses to TCPA claims, a defendant may plead and prove that the calls were made with the "prior express consent" of the recipient, or that the calls were made for "emergency purposes." 47 U.S.C. § 227(b)(1)(A)(iii).

Here, Plaintiff alleges that Defendant violated the TCPA when it sent an introductory text

3

message about its "Outage Alert" text-messaging program to its then-current electric service customers. (Compl. ¶¶ 16, 20.) Defendant created the "Outage Alert" program in January 2012 "in an effort to promote its brand" and "to maximize subscriber satisfaction." (*Id*. ¶¶ 2, 15, 25, n. 3.) One aspect of the Outage Alert program was to send—to those who choose to participate in the program—text messages regarding power outages in their area. (*Id*. ¶ 16.) There were two ways to enroll in the program: online through ComEd's website or via text message by texting "ADD OUTAGE" to ComEd. (*Id*. ¶¶ 17-19.) Plaintiff alleges, however, that toward the end of 2013, Defendant was disappointed by the low number of voluntary enrollments and decided to unilaterally enroll 1.2 million of its then-current customers into the program without their consent or permission. (*Id*. ¶ 20.)

To notify its customers of their enrollment, Plaintiff alleges that Defendant sent the following introductory text message (the "Text Message") to class members in or around November 2013:

> You are now subscribed to ComEd outage alerts. Up to 21 msgs/mo. Visit ComEd.com/text for details. T&C:agent511.com/tandc. STOP to unsubscribe. HELP for info.

(*Id*. ¶¶ 21, 26.) The Text Messages were all sent from SMS shortcode "26633." (*Id*. ¶ 22.)[4] The problem—Plaintiff alleges—was that Defendant did not first obtain its customers' (including Plaintiff's) prior express consent to send this (or any other) text message, (*id*. ¶¶ 3, 20, 21, 23, 24), and the Text Message was not sent for an "emergency purpose" such that it would be exempted under the TCPA, (*id*. ¶¶ 21, 24-25).

---

[4] The SMS shortcode 26633 translates to "ComEd" on a telephone keypad and is an abbreviated telephone number that allows for the rapid mass transmission of text messages.

**B.      The Litigation and Work Performed for the Class's Benefit.**

Class Counsel was able to secure the Settlement only after nearly two years of hard-fought litigation—which included briefing on an issue of first impression and completion of class- and merits-based discovery—against top-tier defense counsel and a well-financed company.

ComEd began its defense by moving to dismiss Plaintiff's Complaint in its entirety on two bases: First, that Plaintiff consented to receive the Text Message by voluntarily providing his cellular telephone number to ComEd as a primary point of contact, and second, that the Text Message fell within the TCPA's "emergency purpose" exception, 47 U.S.C. § 227(b)(1)(A). (*See* Dkt. Nos. 14, 15.) On June 4, 2014, and after full briefing, the Court denied the motion, finding that it would be more appropriate to consider the issues raised by Defendant after discovery on a full record. (Dkt. 21.)

After Defendant filed its Answer (dkt. 22), the parties engaged in both class- and merits-based discovery, and after the close of the discovery deadline, Plaintiff drafted and prepared his motion for class certification and cross-motion for summary judgment. (Declaration of Jay Edelson ["Edelson Decl."], ¶¶ 6-12.) In all, Plaintiff and Class Counsel performed substantial work on behalf of the Class, including by:

- Opposing and defeating Defendant's Rule 12(b)(6) motion to dismiss;

- Serving written discovery on Defendant and analyzing thousands of pages of documents produced in response;

- Engaging in extensive third-party discovery with Agent511 (ComEd's vendor that assisted in the implementation and transmission of the Text Message), mBlox, Inc. (a company involved in the transmission of the Text Message that maintained records of the transmissions), and Neustar, Inc. (the company responsible for the licensing of shortcodes in North America);

5

- Deposing three separate Rule 30(b)(6) corporate representatives that ComEd designated to testify on several topics, such as: (1) the manner in which ComEd contends it obtained prior express consent to transmit the Text Messages, (2) the creation and implementation of the Outage Alert program, (3) the purpose for which the program was created, (4) the manner in which ComEd advertised the program and urged its customers to opt in, (5) ComEd's decision to automatically enroll its customers into the program, (6) the drafting and design of the content of the Text Message, (7) the manner in which ComEd stored or maintained its customers' telephone numbers, (8) the manner in which ComEd allegedly transmitted its customers' telephone numbers to Agent511, (9) the equipment and technology used to transmit the Text Message to Plaintiff and the Class, (10) the business relationship between ComEd and Agent511, and (11) ComEd's policies and procedures relating to compliance with the TCPA;

- Deposing a Rule 30(b)(6) corporate representative that Agent511 designated to testify on several topics, such as (1) the features and components of the mobile messaging services offered by Agent511, (2) the marketing and advertisement of its mobile messaging services to ComEd, (3) its acquisition and provision of shortcode 26633, (4) the features of the mobile messaging services that it provided to ComEd, (5) its alleged acquisition of Plaintiff's and the class members' telephone numbers from ComEd, (6) the manner in which its transmitted the Text Message to Plaintiff and the class, (7) the equipment and technology used to transmit the Text Message to Plaintiff and the class, (8) the nature of its relationship with ComEd, and (9) its polices and procedures relating to compliance with the TCPA;

- Presenting Plaintiff for his deposition;

- Consulting with a recognized industry expert regarding the functionality of the dialing equipment at issue;

- Drafting and preparing "file ready" versions of Plaintiff's Supplemental Motion for Class Certification and Plaintiff's Motion for Summary Judgment;

- Preparing for and participating in two separate in-person mediations with Defendant, which Judge Andersen (ret.) oversaw (discussed further below);

- Drafting and preparing the Settlement Agreement, drafting the notice documents, and exchanging numerous drafts of the same with Defendant;

- Drafting and preparing Plaintiff's Motion for Preliminary Approval of the

> Class Action Settlement and obtaining preliminary approval at the noticed hearing;
>
> • Working in tandem with the Court-approved Settlement Administrator, Heffler Claims Group, LLC ("Heffler") to effectuate the notice plan and to monitor developments in real time; and
>
> • Speaking with numerous class members to aid them in understanding their rights and options under the Settlement and help them with the claims form process.

(Edelson Decl. ¶¶ 6-12, 15.) Further, in addition to the substantial work already performed on behalf of the class, Plaintiff and Class Counsel's efforts are far from over. They must still draft their final approval papers, prepare for the final fairness hearing, communicate with class members about the Settlement, and continue working closely with Heffler to supervise the settlement administration. (*Id.* ¶¶ 17-18.)

## C.    Mediations with Judge Andersen

As detailed in Plaintiff's Motion for Preliminary Approval, (dkt. 55-1), the parties first began to discuss the possibility of settlement soon after Defendant filed its motion to dismiss. On April 2, 2014, the parties took part in an in-person formal mediation session with the Honorable Wayne R. Andersen of JAMS (ret.). (Edelson Decl. ¶ 5.) However, after numerous rounds of discussions regarding the respective claims and defenses, it became apparent that both parties held strong and conflicting viewpoints regarding the case's merits which prevented them from reaching an early settlement. (*Id.*) As such, the parties moved forward with the litigation. (*Id.*)

Ten months later, after the completion of class- and merits-based discovery and on the eve of the class certification and the dispositive motion deadline, the parties resumed settlement discussions. (Edelson Decl. ¶ 13.) On February 5, 2015, the parties agreed to an additional in-person mediation session with Judge Andersen. (*Id.*) On February 19, 2015, after another day-long mediation session, followed by numerous additional rounds of arm's-length negotiations by

phone moderated by Judge Andersen, the parties ultimately agreed on the principal terms of the Settlement. (*Id.* ¶ 13.) Thereafter, the parties negotiated the ancillary terms of the deal, and then exchanged several drafts of the settlement agreement and notice documents until they reached a final agreement on all terms and executed the Settlement Agreement on April 29, 2015. (*Id.* ¶ 14.)

**D.    The Settlement Achieves Strong Relief for the Settlement Class.**

Class Counsel's efforts produced the Settlement that this Court preliminarily approved on April 30, 2015, (dkts. 56, 57), which resolves Plaintiff Grant's and the class members' TCPA claims against ComEd related to the Outage Alert program. The Settlement creates a non-reversionary $4.95 million common fund, from which all approved claims will be paid. (Dkt. 55-1 at ¶ 2.1.) After settlement administration and notice expenses, an incentive award, and attorneys' fees have been paid, each class member who submits a valid claim will be entitled to a *pro rata* share of the Settlement Fund. Based on the current number and projected rate of claims through the end of the claims period, Class Counsel reasonably anticipate that each claiming class member will receive—at a minimum—the full $50 cash payment that was estimated at preliminary approval.[5] (Edelson Decl. ¶ 19.) In addition, the Settlement includes prospective relief that requires Defendant to provide its employees with TCPA compliance training to ensure that it does not send any unlawful text messages going forward. (Dkt. 55-1 at ¶ 2.2.)

Finally, to apprise the class of the Settlement, the parties agreed to a comprehensive multi-part notice plan to be administered by Heffler—a professional settlement administrator—

---

[5] The deadline for claim submissions is October 26, 2015. Thus, the exact amount each individual will receive is presently unknown. Class Counsel will provide the Court with an updated projection of the amount of the anticipated cash awards through its final approval papers and at the final fairness hearing.

which included direct notice via e-mail (where available), bill inserts, postcards (to class members that are not current ComEd customers), a dedicated settlement website, and notice to the relevant government agencies under the Class Action Fairness Act, 28 U.S.C. § 1715. (Dkt. 55-1 at ¶ 4.1.) The emails, bill inserts, and postcards direct class members to the dedicated settlement website—www.comedtextsettlement.com—which contains an electronic version of the claim form that can be submitted online, important court documents, and answers to frequently asked questions. (*Id.* at ¶ 4.1(e).) And now that the class has been notified of the Settlement, Class Counsel have spoken with numerous class members to answer questions they have regarding the Settlement and to assist with claim form submissions. (Edelson Decl. ¶ 18.)

### III. CLASS COUNSEL'S REQUESTED ATTORNEYS' FEE AND EXPENSE AWARD IS REASONABLE, FALLS WITHIN THE MARKET RATE FOR SIMILAR SERVICES, AND THUS SHOULD BE APPROVED.

In common fund settlements like this one, the Seventh Circuit has "consistently directed district courts to do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007) (internal quotations omitted); *see also In re Synthroid Mktg. Litig.*, 264 F.3d 712, 719 (7th Cir. 2001) ("*Synthroid I*") (cautioning that "any method other than looking to prevailing market rates assures random and potentially perverse results"). Ultimately, "the district court's task when determining the appropriate class action attorneys' fee is 'to estimate the contingent fee that class counsel would have negotiated with the class at the outset had negotiations with clients having a real stake been feasible.'" *Wilkins v. HSBC Bank Nevada, N.A.*, 2015 WL 890566, at *9 (N.D. Ill. Feb. 27, 2015) (quoting *In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 744 (7th Cir. 2011)); *see also Synthroid I*, 658 F.3d at 718-19 ("When attorneys' fees are deducted from the class damages, the district court must try to

9

assign fees that mimic a hypothetical *ex ante* bargain between the class and its attorneys.").

Although applicable law in the Seventh Circuit affords district courts the discretion to apply either the "percentage of the fund" or the "lodestar" method in awarding fees in a class action where a common fund is created, *see Americana Art China, Co., Inc. v. Foxfire Printing and Packaging, Inc.*, 743 F.3d 243, 247 (7th Cir. 2014), "[t]he approach favored in the Seventh Circuit is to compute attorneys' fees as a percentage of the benefit conferred upon the class," especially where the percentage accurately reflects the market. *Williams v. Gen. Elec. Capital Auto Lease*, 1995 WL 765266, at *9 (N.D. Ill. Dec. 26, 1995). To determine whether fee awards in complex federal statutory cases, like the instant matter, should be calculated based on the "lodestar" method or a percentage of the common settlement fund afforded to the class members, the Court must look to the prevailing method for compensating counsel in the private market. *Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 1986).

Here, as discussed below, Class Counsel's request for a fee award of $1,650,000, which represents one third of the total Settlement Fund or approximately 36% of the net Settlement Fund (i.e. after deducting notice and administration costs), is fair and reasonable under the Seventh Circuit's market approach.[6] The baseline rate in TCPA common fund cases is 30%, with a potential upward adjustment based upon the specific risks of the case (for example, in *In re Capital One Tel. Consumer Prot. Act Litig.*, 2015 WL 605203, at *18 (N.D. Ill. Feb. 12, 2015)— a significantly less risky case than the instant one—the risk adjustment was an additional 6%.) Based on these criteria, Class Counsel's requested fee is firmly in line with the market and thus,

---

[6] Although in common fund cases like this one, district courts have discretion to apply the lodestar or percentage standard, the Court need only apply one method for computing fees. *See Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1998) ("[W]e have never ordered the district judge to ensure that the lodestar result mimics that of the percentage approach.").

reasonable under the percentage of the fund approach.

**A.      The Base Rate In TCPA Cases Involving Similar Settlement Amounts—Before Taking Risk Into Account—Is 30%.**

To determine both the applicable market and corresponding market rate for attorneys' fees, even *ex post*, courts in the Seventh Circuit look at three factors: "(1) actual fee contracts between plaintiffs and their attorneys; (2) data from similar cases where fees were privately negotiated; and (3) information from class-counsel auctions." *Capital One*, 2015 WL 605203, at *11 (citing *Synthroid I*, 264 F.3d at 719); *see also Kaplan v. Houlihan Smith & Co.*, 2014 WL 2808801, at *3 (N.D. Ill. June 20, 2014) ("This Court's task is to consider whether [the amount of attorneys' fees sought] is consistent with a hypothetical *ex ante* bargain for the attorneys' work on this case.") (citations omitted). In the TCPA class action market, the market rate of fees is well established. Application of the relevant factors shows that in a hypothetical *ex ante* bargain with Class Counsel the class members would have agreed to pay attorneys' fees as a percentage of the non-reversionary common fund, at a base rate of 30%, which would then be adjusted upwards for risk.

**1.      Class Counsel's contingency agreement with Plaintiff is 33% of any sum recovered.**

The first factor looks to whether the plaintiff has an actual agreement with class counsel regarding payment of attorneys' fees. *Capital One*, 2015 WL 605203, at *11 (citing *Synthroid I*, 264 F.3d at 719). Here, Class Counsel's retainer agreement with Plaintiff Grant provides for a contingency fee of 33% of all monies recovered—including the costs of notice and administration—or, in the instant case, $1.65 million. (Edelson Decl. ¶ 4.) While Class Counsel's agreement with Plaintiff suggests the requested fee is reasonable, it is not dispositive of the issue, since it is not conclusive proof of what an *ex ante* negotiation with the class would have been.

*Capital One*, 2015 WL 605203, at *11. The analysis thus proceeds to a comparison of fee awards in similar TCPA cases.

> **2.    Similar TCPA cases confirm that the base rate for fee awards based on a percentage of the recovery analysis is 30%—excluding a risk adjustment—for the first $10 million recovered.**

Although the second and third factors contemplate analyzing fees determined *ex ante* or resulting from court-conducted class counsel auctions, such data is "non-existent" in the TCPA class action market, and the district courts have defined the market by looking to how fees were awarded at the end of similar class actions. *See Capital One*, 2015 WL 605203, at *11; *Wilkins*, 2015 WL 890566, at *10. As a general principle, in common fund class actions, the market rate is computed "as a percentage of the benefit conferred upon the class." *Williams*, 1995 WL 765266, at *9; Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811, 814 (2010) ("Most federal judges choose to award fees by using the highly discretionary percentage-of-the-settlement method."); *Cook*, 142 F.3d at 1013 (noting that calculating attorneys' fees as a percentage is "more efficient for the court and more likely to yield an accurate approximation" of the market).

TCPA class actions are in accord. To determine the market rate for attorneys' fees when the client is a large class seeking minimal statutory damages, such as those provided under the TCPA, the court has repeatedly used the percentage method, observing that a private market for such fees would apply "the compensation scheme that require[s] the least monitoring to align the incentives of the class and its counsel—the percentage method." *Capital One*, 2015 WL 605203, at *10; *see also McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 814-15 (E.D. Wis. 2009) (observing that the percentage method is more appropriate because in a private market, "a contingency fee arrangement...insulates the plaintiffs from any economic risk if their

litigation is ultimately unsuccessful").

Recently, the Honorable James F. Holderman (ret.) performed an extensive analysis using data compiled from seventy-one post-2010 TCPA class action settlements to determine the appropriate market rate for the award of attorneys' fees. *Capital One*, 2015 WL 605203, at *12. This analysis showed that the market rate in a typical TCPA class action is a sliding-scale fee that is calculated based on a percentage of the common fund recovery achieved for the benefit of the settlement class. *Id.* at *16 n.13; s*ee also In re: Synthroid Mktg. Litig.*, 325 F.3d 974, 979 (7th Cir. 2003) ("*Synthroid II*") (providing class counsel 30% of the first $10 million of recovery in a common fund case that then decreases because the market rate percentage of recovery "likely falls as the stakes increase").

The market rate (or sliding scale) for the award of fees in TCPA class actions, prior to accounting for the risks associated with a particular case, is as follows:

| Recovery | Fee Percentage (excluding risk adjustment) |
|---|---|
| First $10 million | 30% |
| Next $10 million | 25% |
| $20 - 45 million | 20% |
| Excess above $45 million | 15% |

*Capital One*, 2015 WL 605203*,* at *16 n.13 (citing *Synthroid II,* 325 F.3d at 979); *see also Wilkins,* 2015 WL 890566, at *10 (applying the 30% market rate fee recovery to the first $10 million of a TCPA class action settlement, which then decreased on a sliding scale); *Craftwood Lumber Co. v. Interline Brands*, 2015 WL 2147679, at *4 (N.D. Ill. May 6, 2015) (same).

Once the appropriate market rate method and percentage are determined, the Seventh Circuit instructs district courts to calculate the applicable attorneys' fee amount by comparing "the ratio of (1) the fee to (2) the fee plus what the class members received." *Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014) (holding that fee awards should solely

derive from the net benefit to the class). In other words, the notice costs and incentive awards are not considered as part of the actual benefit conferred to the class and "thus not part of" the calculation. *Capital One*, 2015 WL 605203, at *10 (quoting *Redman*, 768 F.3d at 630).

Applying that formula here, since the Settlement Fund provides class members $4,595,000 in direct relief (after excluding the notice and settlement administration costs of $350,000[7] and an incentive award of $5,000), a fair and reasonable baseline for attorneys' fees—exclusive of the risk adjustment—is $1,378,500 (i.e. 30%).

**B.** **The Risk Associated with the Litigation Justifies a Fee Award in Excess of 36% of the Net Benefit to the Settlement Class and Certainly One Third of the Total Settlement Fund, which is a Slightly Lesser Amount.**

Analysis of a reasonable fee does not stop with the base market percentage. Another factor to be considered in determining the reasonableness of a class action fee award is the risk of non-payment faced by class counsel, as the estimated magnitude of this risk necessarily affects the price at which class counsel would have been willing to offer their services in an *ex ante* negotiation. *Capital One*, 2015 WL 605203, at *16 (citing *Synthroid I*, 264 F.3d at 721). As the Seventh Circuit has observed, "the need for such an adjustment is particularly acute in class action suits" because "[t]he lawyers for the class receive no fee if the suit fails, so their entitlement to fees is inescapably contingent." *In re Continental Illinois Securities Litigation*, 962 F.2d 566, 569 (7th Cir. 1992); *see also Trans Union,* 629 F.3d at 746–48 (criticizing the district court for failing to make an attempt to determine and quantify the level of risk faced by

---

[7] Notice and administration costs are capped at this amount. (Edelson Decl. ¶ 16.)

Class Counsel when the case was filed);[8] *Capital One*, 2015 WL 605203, at \*15. Indeed, a risk premium is warranted because "[t]he greater the risk of walking away empty-handed, the higher the award must be to attract competent and energetic counsel." *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013). To illustrate, "if the market-determined fee for a sure winner were $1 million the market-determined fee for handling a similar suit with only a 50 percent chance of a favorable outcome should be $2 million." *Trans Union*, 629 F.3d at 746. Ultimately, "a higher risk of loss does argue for a higher fee." *Id.*

1. **The issues in this case show that Class Counsel faced substantial risk**.

In this case, the requested attorneys' fees of $1,650,000 represents an approximately 6% (actually 5.908% to be exact) increase over the 30% base suggested by the market rate. The increase can be attributed to the added risk of losing the case, since succeeding in this litigation is far from certain. Moreover, based on the applicable law, it is clear that Class Counsel would be entitled to at least this amount (i.e., 36% of the net benefit to the class or $1,654,200), but nevertheless chose to limit its request consistent with its agreement with Plaintiff. As demonstrated herein, the upward risk adjustment is both reasonable and entirely justified.

First, Class Counsel faced risks that ComEd could establish a consent defense. (Edelson Decl. ¶ 20.) It is undisputed that Plaintiff and the class members all voluntarily provided their cell phone numbers directly to ComEd when they registered for electric service. (*Id.*) As reflected in the briefing, the issue of whether providing a phone number for any purpose

---

[8] Risk of nonpayment is one of the factors courts evaluate in determining legal fees, along with the quality of the counsel's performance, the amount of work necessary to resolve the litigation, and the stakes of the case. *Synthroid I*, 264 F.3d at 721. As discussed in Section II.B, *supra*, Class Counsel have devoted significant amounts of time, effort, and resources to the quality work-product involved in this high-stakes litigation, including the novel legal issue of whether the alleged calls fell under the TCPA's emergency purpose exception.

constitutes consent to receive messages from the sender was a hotly contested issue. (*See* Dkt. Nos. 15, 16, 20.) Although Plaintiff is confident that he would ultimately defeat ComEd's contention that simply providing one's cell phone number, without more, constitutes "prior express consent," *see Kolinek v. Walgreen Co.*, 2014 WL 3056813, at *4 (N.D. Ill. July 7, 2014), the issue is an unsettled area of the law, and courts have reached differing results on similar facts, *see, e.g., Greene v. DirecTV*, 2010 WL 4628734, *3 (N.D. Ill. Nov. 8, 2010) (holding that provision of a cell phone number as a contact number constitutes prior express consent to be called); *Roberts v. Paypal, Inc.*, 2013 WL 2384242, at *4 (N.D. Cal. May 30, 2013) (holding that the prior provision of a cell phone number to the caller for any reason constitutes prior express consent to be called); *Ryabyshchuck v. Citibank (S.D.) N.A.*, 2012 WL 5379143, at *3 (S.D. Cal. Oct. 30, 2012) (same). Thus, although Plaintiff's claim ultimately survived the motion to dismiss on the issue of consent, it was a substantial obstacle to overcome and demonstrates that the success in this case was never a certainty. *See Wilkins*, 2015 WL 890566, at *6 (noting that "alternative interpretations" of the FCC Orders "will continue to add significant risk to large TCPA litigation until the FCC clarifies the definition of 'prior express consent' under the TCPA") (citing *Capital One*, 2015 WL 605203, at *6).

Second, Class Counsel faced even more risk with respect to the issue of whether the Text Message fell within the TCPA's "emergency purpose" exception—an issue of first impression. (Edelson Decl. ¶ 21.) The only other case Class Counsel is aware of that involved this issue is pending before Judge Kennelly in the case captioned *Kolinek v. Walgreens, Inc.*, No. 13-cv-04806 (N.D. Ill. Apr. 3, 2015) ("Walgreens Dkt."), and the case recently settled on similar terms and received preliminary approval. (Walgreens Dkt. 97 (preliminarily approving settlement that provided for cash payment of approximately $20 to each claiming class member).) Moreover, the

legislative history of the TCPA, coupled with the discovery produced to date, lends at least some support to the defense. (*Id.*) In the end, although Plaintiff maintains (and this Court recognized at the June 4, 2014, hearing, (dkt. 21)) that the Text Message on its face does not alert ComEd customers of an emergency, the question of whether the Text Message falls within the exception remains open. Both parties were preparing to move for summary judgment on this issue, and to the extent that ComEd prevailed on this issue, the class would have recovered nothing. (Edelson Decl. ¶ 22.)  Additionally, if the case proceeded to trial, other roadblocks—such as additional discovery and procurement of expert testimony—would stand in the way of ultimate recovery. (*Id.* ¶ 24.) And, of course, given the amount at stake, the losing party would likely appeal, which would add yet another layer of delay to the already uncertain outcome. (*Id.*)

Ultimately, given the risks associated with the litigation, especially when viewed in comparison to other similar actions, Class Counsel should be awarded a 6% increase for risk.

### 2. This case presented far greater risk than most other TCPA cases.

When the risks faced by Class Counsel here are compared to those faced by counsel in other similar TCPA actions, it becomes all the more apparent that a 6% increase to the base 30% market rate is warranted. *Capital One* establishes this point as well. There, the attorneys requested fees in the amount of 30% of a more than $75 million settlement fund. *Capital One*, 2015 WL 605203, at *9. In analyzing the request and after an extensive analysis on similar fee awards in TCPA class actions, Judge Holderman determined that the case was "only slightly riskier than a typical TCPA class action." *Id.* at *17 (considering "the class members' alleged consent to be called, Rule 23 manageability issues, and potentially forthcoming FCC orders"). Despite that fact, Judge Holderman held that the small risk merited a 6% increase from the base market fee, meaning that class counsel could recover 36% of the first $10 million—instead of

30%—of the common fund benefit to the class. *Id.* at *18 (citing Theodore Eisenberg & Geoffery P. Miller, *Attorney Fees in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Studies 265 (2010)).

Shortly thereafter, in *Wilkins*, Judge Holderman considered the appropriateness of a fee award in another TCPA action where the attorneys asked for more than the sliding-scale percentage market rate provided for in *Capital One. See* 2015 WL 890566, at *9. In denying that request, Judge Holderman found that the case was merely "an average TCPA class action" with "the typical obstacles faced by most TCPA plaintiffs." *Id.* at *11 (finding that the defendant's "consent defense" did not carry "the same weight it did [in] *Capital One*[]" and that the "incentives to settlement . . . would most likely overcome any incentives to litigate"). Because that case provided no substantial risk, the court did not apply a risk enhancer to percentages determined by the base market rate analysis. *Id.*; *see also Craftwood Lumber*, 2015 WL 605203 (refusing on reconsideration to award fee beyond base sliding-scale percentage where legal issues in TCPA fax spam case "were not particularly unique").

Unlike those actions, this case, as discussed above, was not a "typical" TCPA class action. The case involved atypical issues that mounted difficult obstacles—most notably, novel issues about consent and the question of whether the Outage Alert program fell under the TCPA's emergency purpose exception. (Edelson Decl. ¶¶ 20-22.) This Circuit has never ruled on either issue, leaving both questions open. Confronting those two questions—when in most TCPA cases the only real issue is consent—made this case inherently riskier than a typical TCPA case, and lends further support to an enhanced fee award. (*Id.* ¶ 23.)

18

### 3. The Settlement provides a greater benefit than settlements in similar cases.

The risk enhancement becomes even more justified when comparing the benefit this settlement provides to the Settlement Class against the benefits of comparable TCPA settlements. As described in Plaintiff's Motion for Preliminary Approval, the Settlement—in terms of monetary and injunctive relief—is a significant result for the class, both in terms of what the class could have hoped to recover at trial, and in relation to other similar TCPA class action settlements.

With respect to comparable settlements, here the monetary relief of at least $50 per class member exceeds the per class member payout in most other cases of this sort. In the prototypical TCPA case—where individuals alleged they received unsolicited telemarketing calls from entities with which they have no connection or relationship—class members generally receive no more than $200. *See, e.g., Kramer v. Autobytel, Inc.*, No. 10-cv-2722, Dkt. 148 (N.D. Cal. 2012) (providing for a cash payment of $100 to each class member); *Weinstein v. The Timberland Co., et al.*, No. 06-cv-00484, Dkt. 93 (N.D. Ill. 2008) (providing for a cash payment of $150 to each class member); *Satterfield v. Simon & Schuster, Inc., et al.,* No. 06-cv-2893, Dkt. 132 (N.D. Cal. 2010) (providing for a cash payment of $175 to each class member); *Lozano v. Twentieth Century Fox Film Corp.*, No. 09-cv-6344, Dkt. 65 (N.D. Ill. 2011) (providing for a cash payment of $200 to each class member). But in "direct relationship" TCPA cases, like the instant one, where the person called voluntarily provided their cellular telephone number to the caller, generally result in coupon settlements or small cash awards. *See Kazemi v. Payless Shoesource, Inc.*, No. 09-cv-5142, Dkt. 94 (N.D. Cal. 2012) (providing for a $25 voucher to each class member); *In re Jiffy Lube Int'l, Inc. Text Spam Litig.*, No. 11-md-2261, Dkt. 97 (S.D. Cal. 2013) (providing for a $20 voucher, which could be redeemed for $15 cash after nine-month waiting

period).

In the end, the projected individual recovery of at least $50 alone supports the fact that this Settlement represents an exceptional result for the settlement class. And when the heightened risks of the action and awards in similar TCPA actions are considered, the requested risk enhancer of 6%—which is the same as the 6% awarded for only a "slightly" risky case—is more than fair in this instance. *See Capital One*, 2015 WL 605203, at *15 (finding that a 6% increase—for a total percentage recovery of 36%—was justified in a TCPA case that was only "slightly riskier" than a typical TCPA case with a more than $75 million settlement fund). Accordingly, the market rate and risk factors assumed in this litigation confirms that an award of $1,650,000 to Class Counsel is both reasonable and justified.

## IV.   PLAINTIFF'S REQUEST FOR $5,000 REPRESENTS A FAIR AND REASONABLE INCENTIVE AWARD.

Grant's agreed-upon incentive award of $5,000 for serving as the class representative is also a fair and reasonable one. Because a plaintiff is essential to any class action, "[i]ncentive awards are justified when necessary to induce individuals to become named representatives." *Synthroid I*, 264 F.3d at 722-23. In deciding whether an incentive award is reasonable, factors relevant to the court's inquiry include the actions the plaintiff has taken to protect the interests of the class, the amount of time and effort the plaintiff expended in pursuing the litigation, and the degree to which the class has benefitted from those actions. *Cook*, 142 F.3d at 1016.

These factors are readily satisfied in the instant action. Grant has worked alongside Class Counsel and actively engaged in every stage of the litigation—reviewing the complaint and other documents, equipping Class Counsel with the information needed to pursue his (and the class's) claims, sitting for a day-long deposition, and responding to requests for additional information throughout the settlement process. (Edelson Decl. ¶¶ 25-27.) Were it not for Grant's efforts and

contributions to the litigation, the class would not have obtained the substantial benefit conferred by the Settlement. (*Id*. ¶ 28.) Further, the proposed incentive award of $5,000 is in line with those awards approved in similar class action settlements. *See Capital One*, 2015 WL 605203, at *19 (granting requested incentive awards of $5,000 for each named plaintiff in a TCPA class action settlement). Accordingly, the requested incentive award is reasonable and should be approved.

**V.     CONCLUSION**

For the reasons stated above, Plaintiff Michael Grant respectfully requests that the Court approve the requested fee award in the amount of $1,650,000, approve the requested incentive award of $5,000 to Plaintiff Grant, and award such other and further relief the Court deems equitable and just.

Respectfully submitted,

**MICHAEL GRANT**, individually and on behalf of a class of similarly situated individuals,

Dated: July 23, 2015                By: _____
One of Plaintiff's Attorneys

Jay Edelson
jedelson@edelson.com
Rafey S. Balabanian
rbalabanian@edelson.com
Ari J. Scharg
ascharg@edelson.com
John C. Ochoa
jochoa@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| MICHAEL GRANT, individually and on behalf of all others similarly situated, | Case No. 1:13-cv-8310 |
| *Plaintiff*, | |
| v. | Hon. Gary Feinerman |
| COMMONWEALTH EDISON COMPANY, an Illinois corporation, | |
| *Defendant*. | |

**DECLARATION OF JAY EDELSON IN SUPPORT OF PLAINTIFF'S MOTION FOR
APPROVAL OF ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD**

Pursuant to 28 U.S.C. § 1746, I hereby declare and state as follows:

1.     I am an attorney admitted to practice in the United States District Court for the

Northern District of Illinois. I am submitting this declaration in support of Plaintiff's Motion and

Memorandum of Law in Support of Approval of Attorneys' Fees, Expenses, and Incentive

Award. This declaration is based upon my personal knowledge unless otherwise indicated. If

called upon to testify as to the matters stated herein, I could and would competently do so.

2.     I am the Managing Partner at Edelson PC, which has been retained to represent

the named Plaintiff in this matter, Michael Grant ("Grant" or "Plaintiff"). I, along with my

colleagues Rafey S. Balabanian and Ari J. Scharg, have been appointed Class Counsel in this

matter.

***The Litigation and Settlement History***

3.     On November 19, 2013, my firm filed suit against Defendant Commonwealth

Edison Company ("Defendant" or "ComEd") on behalf of Plaintiff Grant in the United States

District Court for the Northern District of Illinois.

4.     Class Counsel agreed to undertake Plaintiff's case on a contingent fee basis. Class Counsel's retainer agreement with Plaintiff Grant provides for a contingency fee of 33% of any sum recovered.

5.     After filing the lawsuit, on February 21, 2014, ComEd filed a motion to dismiss, which Plaintiff opposed. During the briefing on this motion to dismiss, the parties began to discuss the possibility of resolving the case before additional protracted litigation. On April 2, 2014, the parties took part in an in-person formal mediation session with the Honorable Wayne R. Andersen of JAMS (ret.). However, after numerous rounds of discussions regarding the respective claims and defenses, it became apparent that both parties held strong and conflicting viewpoints regarding the case's merits which prevented them from reaching an early settlement. As such, the parties moved forward with litigation.

6.     Shortly after the Court denied ComEd's motion to dismiss and ComEd answered Plaintiff's Complaint, the Parties began to exchange discovery. Specifically, Plaintiff served written discovery on ComEd and analyzed the thousands of pages of documents ComEd produced in response.

7.     Plaintiff also engaged in extensive third-party discovery with Good Egg Media LLC d/b/a Agent511 ("Agent511") (ComEd's vendor that assisted in the implementation and transmission of the Text Message), mBlox, Inc. (a company involved in the transmission of the Text Message that maintained records of the transmissions), and Neustar, Inc. (the company responsible for the licensing of shortcodes in North America).

8.     On November 13th and 18th of 2014, after receiving documents in discovery, Plaintiff deposed three separate Rule 30(b)(6) corporate representatives that ComEd designated

2

to testify on various topics, such as: (1) the manner in which ComEd contends it obtained prior express consent to transmit the Text Messages, (2) the creation and implementation of the Outage Alert program, (3) the purpose for which the program was created, (4) the manner in which ComEd advertised the program and urged its customers to opt in, (5) ComEd's decision to automatically enroll its customers into the program, (6) the drafting and design of the content of the Text Message, (7) the manner in which ComEd stored or maintained its customers' telephone numbers, (8) the manner in which ComEd allegedly transmitted its customers' telephone numbers to Agent511, (9) the equipment and technology used to transmit the Text Message to Plaintiff and the Class, (10) the business relationship between ComEd and Agent511, and (11) ComEd's policies and procedures relating to compliance with the TCPA.

9.     On October 30, 2014, Plaintiff deposed a Rule 30(b)(6) corporate representative that Agent511 designated to testify on various topics, such as (1) the features and components of the mobile messaging services offered by Agent511, (2) the marketing and advertisement of its mobile messaging services to ComEd, (3) its acquisition and provision of shortcode 26633, (4) the features of the mobile messaging services that its provided to ComEd, (5) its alleged acquisition of Plaintiff's and the putative Class's telephone numbers from ComEd, (6) the manner in which its transmitted the Text Message to Plaintiff and the Class, (7) the equipment and technology used to transmit the Text Message to Plaintiff and the Class, (8) the nature of its relationship with ComEd, and (9) its polices and procedures relating to compliance with the TCPA.

10.     On July 15, 2014, ComEd took Plaintiff Grant's deposition.

11.     In addition to this discovery, Plaintiff consulted with a recognized industry expert regarding the functionality of the dialing equipment used to transmit the text messages at issue.

3

12. After discovery was complete, Plaintiff drafted and prepared "file ready" versions of Plaintiff's Supplemental Motion for Class Certification and Plaintiff's Motion for Summary Judgment.

13. After the completion of class- and merits-discovery, and on the eve of the class certification and dispositive motions deadline, the parties resumed settlement discussions. On February 5, 2015 the parties agreed to an additional in-person mediation session with Judge Andersen. On February 19, 2015, after another full day of in-person mediation and numerous additional rounds of arms'-length negotiations by phone moderated by Judge Andersen, the Parties ultimately agreed on the principal terms of the Settlement.

14. Thereafter, the parties negotiated the ancillary terms of the deal, and then exchanged several drafts of the settlement agreement and notice documents until they reached a final agreement on all terms and executed the Settlement Agreement on April 29, 2015.

15. After the Settlement was executed, Class Counsel prepared and filed Plaintiff's Motion for Preliminary Approval of the Class Action Settlement and obtained preliminary approval. Since that time, Class Counsel has worked in tandem with the Court-approved Settlement Administrator, Heffler Claims Group, LLC ("Heffler") to ensure that the notice plan is effectuated and to monitor developments in real time.

16. The cost of implementing the notice plan for the instant Settlement is capped at $350,000.

17. In addition to the substantial work already performed on behalf of the class, Plaintiff and Class Counsel must still draft their final approval papers, prepare for the final fairness hearing, communicate with class members about the Settlement, and continue working closely with Heffler to supervise the settlement administration.

18.     Indeed, now that the class has been notified of the Settlement, Class Counsel have spoken with scores of class members to answer questions they have regarding the settlement and to assist with claim form submissions.

19.     Based on the current number and projected rate of claims through the end of the claims period, Class Counsel reasonably anticipate that each claiming class member will receive—at a minimum—the full $50 cash payment that was estimated at preliminary approval.

***The Risks Attendant to this Litigation***

20.     Class Counsel faced risks in this litigation, including that ComEd could establish a consent defense. It is undisputed that Plaintiff and the class members all voluntarily provided their cell phone numbers directly to ComEd when they registered for electric service.

21.     In addition, Class Counsel faced even more risk with respect to the issue of whether the Text Message fell within the TCPA's "emergency purpose" exception—an issue of first impression. The legislative history of the TCPA, coupled with the discovery produced to date, lends at least some support to the defense.

22.     Although Plaintiff maintains (and this Court recognized at the June 4, 2014, hearing, (dkt. 21)) that the Text Message on its face does not alert ComEd customers of an emergency, the question of whether the Text Message falls within the exception remains open. Both parties were preparing to move for summary judgment on this issue, and to the extent that ComEd prevailed on this issue, the class would have recovered nothing.

23.     These two issues—when in most TCPA cases the only real issue is consent—made this case inherently riskier than a typical TCPA case, and lends further support to an enhanced fee award.

24.     Additionally, if the case proceeded to trial, other roadblocks—such as additional

discovery and procurement of expert testimony—would stand in the way of ultimate recovery. And, of course, given the amount at stake, the losing party would likely appeal, which would add yet another layer of delay to the already uncertain outcome.

### Plaintiff Grant's Efforts in the Litigation

25.     I believe that Mr. Grant, as Class Representative, dutifully represented the interests of the class in this case.

26.     Throughout the litigation process, Mr. Grant made clear that he understood that serving as a named plaintiff and putative class representative carried significant responsibilities, and in that role, he would be required to pursue the action not only on his own behalf, but, more importantly, on behalf of the putative class he sought to represent.

27.     Grant has worked alongside Class Counsel and actively engaged in every stage of the litigation—reviewing the complaint and other documents, equipping Class Counsel with the information needed to pursue his (and the class's) claims, sitting for a day-long deposition, and responding to requests for additional information throughout the settlement process.

28.     Were it not for Mr. Grant's efforts and contributions to the litigation, the class would not have obtained the substantial benefit conferred by the settlement.

                    *                    *                    *

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23rd day of July at Chicago, Illinois.


                                        /s/  Jay Edelson