**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| MICHAEL GRANT, individually and on behalf of all others similarly situated, | Case. No. 13-cv-08310 |
| *Plaintiff*, | [Hon. Gary Feinerman] |
| *v.* | |
| COMMONWEALTH EDISON COMPANY, an Illinois corporation, | |
| *Defendant*. | |

---

**PLAINTIFF'S MOTION AND MEMORANDUM IN SUPPORT OF**
**FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

---

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................................1

II.     BACKGROUND .............................................................................................................3

        A.      The Facts, the Law, and the Litigation History ..............................................3

        B.      The Mediations and the Settlement Agreement ..............................................5

III.    The Terms of the Settlement ......................................................................................6

        A.      Class Definition ..............................................................................................6

        B.      Notice .............................................................................................................7

        C.      Class Member Payments ................................................................................7

        D.      Prospective Relief ..........................................................................................7

        E.      Additional Relief ...........................................................................................8

                1.      Payment of Notice and Settlement Administration Expenses ...............8

                2.      Payment of Incentive Award for Class Representative .........................8

                3.      Payment of Attorneys' Fees and Expenses ..........................................8

        F.      Release ............................................................................................................8

IV.     The Implemented Notice Plan Comports with Due Process .........................................8

V.      The Settlement Warrants Final Approval ..................................................................10

        A.      The Value of this Settlement in Light of the Risks of Continuing the
                Litigation Favors Final Approval..................................................................11

                1.      The case presented numerous risks that made recovery on behalf of
                        the class uncertain.................................................................................12

                2.      In light of the risks attendant to this litigation, the relief provided to
                        the Settlement Class is substantial .......................................................15

        B.      The Likelihood of an Increase in the Complexity, Length, and Expense of
                Continued Litigation Validates Final Approval of the Settlement.................16

**C.** **The Complete Lack of Opposition to the Settlement Weighs in Favor of Final Approval** ...........................................................................................17

**D.** **The Opinion of Competent Counsel Favors Final Approval** ...........................18

**E.** **The Stage of the Proceedings and Amount of Discovery Completed Weigh in Favor of Final Approval** ...........................................................................20

**F.** **The Settlement is not a Product of Collusion and There are No "Red Flags" Present** ...........................................................................................22

**CONCLUSION** ........................................................................................................24

**TABLE OF AUTHORITIES**

**United States Supreme Court Cases**

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) ....................................................9

*Mims v. Arrow Fin. Servs. LLC*, 132 S. Ct. 740 (2012)................................................4

**United States Circuit Court of Appeals Cases**

*Armstrong v. Bd. of Sch. Directors of City of Milwaukee*, 616 F.2d 305 (7th Cir. 1980) .............20

*Burns v. Elrod*, 757 F.2d 151 (7th Cir. 1985) ..................................................................9

*Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014)...............................................11-12, 22-24

*Isby v. Bayh*, 75 F.3d 1191 (7th Cir. 1996)....................................................10, 12, 20

*Safeco Ins. Co. of Am. v. Am. Int'l Grp.*, 710 F.3d 754 (7th Cir. 2013) .......................................10

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009)...............................................4

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646 (7th Cir. 2006)......... 11-12, 18, 20

*Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978 (7th Cir. 2002).................... 10-11

**United States District Court Cases**

*Aboudi v. T-Mobile USA, Inc.*, 2015 WL 4923602 (S.D. Cal. Aug. 18, 2015) ............................18

*Aderhold v. Car2go N.A., LLC*, 2014 WL 794802 (W.D. Wash. Feb. 27, 2014).........................13

*Baird v. Sabre, Inc.*, 995 F. Supp. 2d 1100 (C.D. Cal. 2014)........................................................13

*Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*,
    2012 WL 651727 (N.D. Ill. Feb. 28, 2012) ............................................. 10, 11, 20, 21-22

*Bickel v. Sheriff of Whitley Cnty.*, 2015 WL 1402018 (N.D. Ill. 2011) .......................................10

*Butler v. Am. Cable & Tel., LLC*, 2011 WL 2708399 (N.D. Ill. July 12, 2011).........................22

*Dennis v. Kellogg Co.*, 2013 WL 6055326 (S.D. Cal. Nov. 14, 2013)............................................1

*Dunstan v. comScore*, No. 11-cv-5807, Dkts. 186, 369 (N.D. Ill.)......................................... 18-19

*Ellison v. Steven Madden, Inc.*, No. 11-cv-05935, Dkt. 73 (C.D. Cal. May 7, 2013) ..................19

*Goldsmith v. Tech. Solutions, Co.*, 1995 WL 17009594 (N.D. Ill. Oct. 10, 1995)........................17

*Greene v. DirecTV*, 2010 WL 4628734 (N.D. Ill. Nov. 8, 2010) ...................................13

*Hispanics United v. Vill. of Addison*, 988 F. Supp. 1130 (N.D. Ill. 1997) ....................18

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*,
  270 F.R.D. 330 (N.D. Ill. 2010).......................................................................12

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*,
  789 F. Supp. 2d 935 (N.D. Ill. 2011) ........................................................11, 17

*In re Capital One TCPA Litig.*, 2015 WL 605203 (N.D. Ill. Feb. 12, 2015)................................15

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. 531 (N.D. Cal. 2012)........................1

*In re Facebook Privacy Litig.*, No. C 10-02389 (N.D. Cal. Dec. 10, 2010)................................18

*In re Jiffy Lube Int'l, Inc. Text Spam Litig.*,
  No. 3:11-MD-02261, Dkt. 97 (S.D. Cal. 2013) ......................................2, 15, 19

*In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002 (N.D. Ill. 2000) ................................17

*Kazemi v. Payless Shoesource, Inc.*, No. 3:09-cv-05142, Dkt. 94 (N.D. Cal. 2012).................2, 15

*Kolinek v. Walgreens, Inc.*, No. 13-cv-04806, Dkt. 97 (N.D. Ill. Apr. 3, 2015)............................14

*Kolinek v. Walgreen Co.*, 2014 WL 3056813 (N.D. Ill. July 7, 2014) ..........................................13

*Kramer v. Autobytel, Inc., et al.*, No. 10-cv-2722, Dkt. 148 (N.D. Cal. 2012).........................2, 15

*Lozano v. Twentieth Century Fox Film Corp.*,
  No. 09-cv-6344, Dkt. 65 (N.D. Ill. 2011) .............................................2, 15, 19

*Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999 (N.D. Ill. 2010)....................4

*Myszka v. National Collegiate Scouting Ass'n, Inc.*,
  2014 WL 1364468 (N.D. Ill. Mar. 19, 2014)........................................... 17-18

*Roberts v. Paypal, Inc.*, 2013 WL 2384242 (N.D. Cal. May 30, 2013) .......................................13

*Rojas v. Career Educ. Corp.*, No. 10-cv-5260, Dkt. 55 (N.D. Ill.)...............................................19

*Ryabyshchuck v. Citibank (S.D.) N.A.*, 2012 WL 5379143 (S.D. Cal. Oct. 30, 2012) .................13

*Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560 (N.D. Ill. 2011)................................ 9-10, 16, 18

*Weinstein v. The Timberland Co., et al.*, No. 06-cv-00484, Dkt. 93 (N.D. Ill. 2008) ..............2, 15

*Wilkins v. HSBC Bank Nevada, N.A.*, 2015 WL 890566 (N.D. Ill. Feb. 27, 2015) .......................9

*Zeidel v. YM LLC USA*, 2015 WL 1910456 (N.D. Ill. Apr. 27, 2015) .........................................13

## Statutes

Fed. R. Civ. P. 23 ..............................................................................................................10

28 U.S.C. § 1715 .................................................................................................................7

28 U.S.C. § 2342(1) ...........................................................................................................13

47 U.S.C. § 227 ........................................................................................................... *passim*

## Other Authority

Federal Judicial Ctr., *Judges' Class Action Notice & Claims Process Checklist & Plain Language Guide* 3 (2010) ...........................................................................................................9

*In re GroupMe, Inc./Skype Communications S.A.R.L Petition for Expedited Declaratory Ruling, Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, Declaratory Ruling, 29 FCC Rcd. 3442 (Mar. 27, 2014) ...................................................................................................13

## I.    INTRODUCTION

On June 8, 2015, this Court preliminarily approved the Class Action Settlement Agreement[1] ("Settlement" or "Agreement") reached between Plaintiff Michael Grant ("Plaintiff" or "Grant") and Defendant Commonwealth Edison Company ("Defendant" or "ComEd"), and directed that Notice[2] be disseminated to the Settlement Class. (Dkt. 57.) The Notice Plan approved by the Court has now been implemented and direct notice has reached approximately 93% of the Settlement Class. The Class' response to the Settlement can only be characterized as overwhelmingly positive—not a single one of the approximately 1.2 million Settlement Class members objected to the Settlement, and only four requested to be excluded. The fact that no objections were filed at a time when the professional objector bar is both incredibly active and aggressive in seeking out and objecting to class action settlements (*See, e.g., In re Cathode Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. 531, 531 (N.D. Cal. 2012); *Dennis v. Kellogg Co.*, 2013 WL 6055326, at *4 n.2 (S.D. Cal. Nov. 14, 2013), *appeal dismissed* (May 15, 2014) (noting that "a cottage industry has developed of professional objectors . . . ."), is no coincidence. It's because of the strength of the Settlement.

To recap the relief, ComEd agreed to establish a $4.95 million non-reversionary common fund (the "Settlement Fund") and implement certain protocols to ensure that its privacy practices remain consistent with the consumer protections required by the TCPA. If the Court finally approves the Settlement, each Settlement Class member who files an Approved Claim (by submitting a one-page, easy to understand claim form, either online or by mail) is estimated to receive approximately $210. While Class Counsel conservatively estimated at preliminary

---

[1]    A copy of the Settlement Agreement is attached as Exhibit 1.
[2]    Unless otherwise indicated, capitalized terms have the definitions ascribed to them in the Settlement.

approval that claiming Class Members would receive at least $50, Counsel is pleased to report that, based on the current and expected rate of claims, Class Members will receive well in excess of that. Such a result provides the Settlement Class with far more relief than what is commonly awarded in "direct relationship" cases such as this one (i.e., where the class members provided their telephone numbers to Defendant prior to receiving calls), *see Kazemi v. Payless Shoesource, Inc.*, No. 3:09-cv-05142, Dkt. 94 (N.D. Cal. 2012) (providing for a $25 voucher to each claiming class member); *In re Jiffy Lube Int'l, Inc. Text Spam Litig.*, No. 3:11-MD-02261, Dkt. 97 (S.D. Cal. 2013) (providing each claiming class member a $20 voucher, which could be redeemed for $15 cash after expiration of nine month waiting period), and even surpasses settlement amounts in so-called "spam" text message cases, where the text recipients had no prior relationship with the defendant. *See, e.g., Kramer v. Autobytel, Inc., et al.*, No. 10-cv-2722, Dkt. 148 (N.D. Cal. 2012) (providing for a cash payment of $100 to each claiming class member); *Weinstein v. The Timberland Co., et al.*, No. 06-cv-00484, Dkt. 93 (N.D. Ill. 2008) (providing for a cash payment of $150 to each claiming class member); *Lozano v. Twentieth Century Fox Film Corp.*, No. 09-cv-6344, Dkt. 65 (N.D. Ill. 2011) (providing for a cash payment of $200 to each claiming class member).

In the end, if the Settlement is finally approved, thousands of claiming Settlement Class members will receive an estimated $210 in cash, ComEd will change its practices to ensure it complies with the TCPA going forward, and the Parties will be able to call an end to almost two years of hard-fought and expensive litigation. For these reasons, and those discussed further below, Plaintiff respectfully requests that the Court grant final approval of the Parties' Settlement Agreement.

## II. BACKGROUND

### A. The Facts, the Law, and the Litigation History.

Defendant ComEd is the largest electric utility company in Illinois. (Dkt. 1 ["Compl."] ¶ 1.) Defendant created an "Outage Alert" program in January 2012 "in an effort to promote its brand" and "to maximize subscriber satisfaction." (*Id*. ¶¶ 2, 15, 25, n. 3.) One aspect of the Outage Alert program was to send—to those customers who requested to participate in the program—text messages regarding power outages in their area. (*Id*. ¶ 16.)

Plaintiff alleges that toward the end of 2013, Defendant, disappointed by the low number of voluntary enrollments in the Outage Alert program, decided to unilaterally enroll its then-current customers who had cellular telephone numbers into the program. (Compl. ¶¶ 2, 20.) To notify its customers of their auto-enrollment, Plaintiff alleges that Defendant sent the following introductory text message to its customers in or around November 2013:

> You are now subscribed to ComEd outage alerts. Up to 21 msgs/mo. Visit ComEd.com/text for details. T&C:agent511.com/tandc. STOP to unsubscribe. HELP for info.

(*Id*. ¶¶ 21, 26.) The Text Messages were all sent from SMS shortcode "26633." (*Id*. ¶ 22.)[3] The problem with the Text Message—Plaintiff alleges—was that ComEd did not first obtain its customers' (including Plaintiff's) prior express consent to send this (or any other) text message. (*Id*. ¶¶ 3, 20, 21, 23, 24.)

Given this lack of consent, Plaintiff brought this suit on November 19, 2013, alleging a single claim under the TCPA. (Declaration of Jay Edelson ["Edelson Decl."], attached as Exhibit 2, at ¶ 3.) Congress enacted the TCPA more than two decades ago to prevent "intrusive nuisance calls" to consumers that it deemed "invasive of privacy," *Mims v. Arrow Fin. Servs. LLC*, 132 S.

---

[3]     The SMS shortcode 26633 translates to "ComEd" on a telephone keypad and is an abbreviated telephone number that allows for the rapid mass transmission of text messages.

Ct. 740, 744 (2012), and set statutory damages in the amount of $500 per violation in addition to providing for injunctive relief, *see* 47 U.S.C. § 227(b)(3)(A)-(C). The TCPA specifically prohibits the use of equipment termed an "automatic telephone dialing system" to place calls to cellular phones, providing that:

> It shall be unlawful for any person within the United States…(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system…to any telephone number assigned to any…cellular telephone service…

47 U.S.C. § 227(b)(1)(A)(iii).

The TCPA applies to traditional phone calls as well as text message calls. *Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999, 1009 (N.D. Ill. 2010); *see also Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009). As defenses to TCPA claims, a defendant may plead and prove that the calls were made with the "prior express consent" of the recipient or that the calls were made for "emergency purposes." 47 U.S.C. § 227(b)(1)(A).

Defendant began its defense of this case by moving to dismiss Plaintiff's Complaint in its entirety based on these two defenses—consent and "emergency purpose." First, Defendant argued that that Plaintiff consented to receive the Text Message by voluntarily providing his cellular telephone number to Defendant as a primary point of contact. Second, ComEd argued that the Text Message fell within the TCPA's "emergency purpose" exception, 47 U.S.C. § 227(b)(1)(A), claiming that the Text Message was a "necessary step" towards alerting its customers to power outages. (*See* Dkt. 15; Edelson Decl. ¶ 4.) On June 4, 2014, after full briefing, the Court denied the motion, finding that it would be more appropriate to consider the issues raised by Defendant after discovery on a full record. (Dkt. 21.)

After Defendant filed its Answer (dkt. 22), the Parties engaged in six months of class and

merits-based discovery. This included substantial written discovery, during which time the parties exchanged thousands of documents (Edelson Decl. ¶¶ 7-10.) Additionally, Plaintiff engaged in extensive third-party discovery with Agent511 (Defendant's vendor that assisted in the implementation and transmission of the Text Message), mBlox, Inc., (a company involved in the transmission of the Text Message that maintained records of the transmissions), and Neustar, Inc., (the company responsible for the licensing of shortcodes in the United States). (*Id.* ¶ 9.) After receiving these and analyzing the documents produced by Defendant and third parties, Plaintiff deposed three corporate representatives that ComEd designated under Rule 30(b)(6) and another corporate representative that Agent511 similarly designated. (*Id.* ¶¶ 8-9.) Defendant also took Plaintiff's deposition. (*Id.* ¶ 10.)

Through discovery, it was revealed that Defendant was able to collect the telephone numbers of the customers who were unilaterally enrolled in the Outage Alert program because the customers had previously provided their cellular telephone numbers to Defendant when registering for electric service. (Edelson Decl. ¶ 14.) After the parties completed this discovery, Plaintiff drafted and prepared for filing (though ultimately never filed) his motion for class certification, as well as his cross-motion for summary judgment, both of which were due to be filed on March 2, 2015. (*Id.* ¶ 11; Dkt. 41.)

**B.      The Mediations and the Settlement Agreement.**

The Parties first began to discuss the possibility of settlement soon after Defendant filed its motion to dismiss. On April 2, 2014, the Parties took part in an in-person, formal mediation session with the Honorable Wayne R. Andersen of JAMS (ret.). (Edelson Decl. ¶ 5.) However, after numerous rounds of discussions regarding the respective claims and defenses, it became apparent that both Parties held strong and very different views of the case's merits, which

prevented them from reaching a settlement at that time. (*Id.* ¶ 6.) As such, the Parties moved forward with the litigation. (*Id.*)

Ten months later, after the completion of class- and merits-based discovery, and on the eve of the class certification and dispositive motion deadline, the Parties resumed settlement discussions. (Edelson Decl. ¶ 11.) On February 5, 2015, the parties agreed to an additional in-person mediation session with Judge Andersen. (*Id.*) On February 19, 2015, after another day-long mediation session, followed by numerous additional rounds of arms'-length negotiations by phone moderated by Judge Andersen, the Parties ultimately agreed on the principal terms of the Settlement. (*Id.*) Thereafter, the parties negotiated the ancillary terms of the deal, and then exchanged several drafts of the settlement agreement and notice documents until they reached a final agreement on all terms and executed the Settlement Agreement on April 29, 2015. (*Id.* ¶ 12.)

On June 8, 2015, this Court granted preliminary approval of the Settlement Agreement, (dkt. 57), and directed that Notice be disseminated to the Settlement Class in accordance with the Notice Plan set forth in the Settlement. (*Id.* ¶ 2.) Pursuant to the Court's Order granting preliminary approval, notice was effectuated shortly thereafter, with direct notice reaching approximately 93% of the Settlement Class. (*See* Declaration of Brian Radetich ["Radetich Decl."] ¶ 13, attached hereto as Exhibit 3.)

## III.    THE TERMS OF THE SETTLEMENT

The terms of the Settlement preliminarily approved by the Court are set forth in the Settlement Agreement and briefly summarized as follows:

**A.    Class Definition.** The Settlement Class consists of "all individuals in the United States who were sent the following text message on their cellular phone without their consent:

> You are now subscribed to ComEd outage alerts. Up to 21 msgs/mo. Visit ComEd.com/text for details. T&C:agent511.com/tandc. STOP to unsubscribe. HELP for info[,]"

(Settlement ¶¶ 1.27; 1.30).

**B.** **Notice.** To ensure that the notice satisfies the requirements of due process and Rule 23 in both form and content, the Parties agreed to a comprehensive notice plan, which included: (1) direct notice to Settlement Class members who are current ComEd customers via email and bill insert; (2) direct notice to former customers whose contact information is obtainable based on ComEd's records and reverse lookup results via postcard; (3) the creation of a settlement website "www.comedtextsettlement.com," which contains electronic versions of claim forms that can be submitted online, important court documents, and answers to frequently asked questions; (4) the creation of a toll-free telephone number where Settlement Class members can request a claim form and learn more about the Settlement; and (5) the provision of notice of the Settlement to the Attorney General of the United States, the Attorneys General of each state pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715. (Settlement ¶ 4.1.)

**C.** **Class Member Payments.** The Settlement provides for the establishment of a $4,950,000 non-reversionary Settlement Fund, from which each member of the Settlement Class who submits an Approved Claim shall be entitled to a *pro rata* portion of the Settlement Fund after payment of all Settlement Administration Expenses, incentive award to the Class Representative, and the Fee Award to Class Counsel. (Settlement ¶¶ 1.29, 2.1.)

**D.** **Prospective Relief.** In addition to monetary relief, the Settlement Class members will be entitled to prospective relief to reduce the likelihood that ComEd customers will be subjected to unlawful telephone calls and text messages in the future. Defendant has agreed that

it will provide training concerning TCPA compliance to its key managers responsible for consumer communications. (*Id.* ¶ 2.2.)

  **E.**  **Additional Relief.** In addition to the individual monetary payments and the prospective relief discussed above, Defendant has agreed to provide the following relief:

    *1.*  ***Payment of Notice and Settlement Administration Expenses.*** Defendant has agreed to pay from the Settlement Fund the costs of effectuating the Court-approved notice plan, as well as all costs attendant with administration of the Settlement. (*Id.* ¶ 1.25.)

    *2.*  ***Payment of Incentive Award for Class Representative.*** Defendant has agreed, subject to Court approval, to pay Plaintiff an incentive award of $5,000, in addition to any money he will receive as a claiming member of the Settlement Class. (*Id.* ¶ 8.3.)

    *3.*  ***Payment of Attorneys' Fees and Expenses.*** Defendant has agreed, subject to Court approval, to pay Class Counsel reasonable attorneys' fees and to reimburse litigation costs. (*Id.* ¶¶ 1.11, 8.1.) On July 28, 2015, Plaintiff submitted his Motion for Approval of Attorneys' Fees, Expenses, and Incentive Award, requesting attorneys' fees in the amount of $1,650,200. (Dkt. 61.)

  **F.**  **The Release.** Should the Court grant final approval to the Settlement Agreement, Defendant will receive a full release of all claims held by Settlement Class members related to the transmission of the Text Message to members of the Settlement Class. (Settlement ¶¶ 1.22, 3.1-3.2.)

## IV.  THE IMPLEMENTED NOTICE PLAN COMPORTS WITH DUE PROCESS.

  Prior to granting final approval to this Settlement, the Court must first consider whether the notice to the Settlement Class is "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed.

R. Civ. P. 23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 595 (N.D. Ill. 2011). The "best notice practicable" does not require receipt of actual notice by all class members in order to comport with both Rule 23 and the requirements of due process, but it often includes direct notice to individuals who can be identified by either email or regular mail. *See Wilkins v. HSBC Bank Nevada, N.A.,* 2015 WL 890566, at *3 (N.D. Ill. Feb. 27, 2015) (finding that direct notice was appropriate by email and regular mail); *see also Burns v. Elrod*, 757 F.2d 151, 154 (7th Cir. 1985) (noting that "Rule 23 does not require defendants to exhaust every conceivable method of identification"). The Federal Judicial Center has concluded that a notice plan that reaches at least 70% of the class is reasonable. Federal Judicial Ctr*., Judges' Class Action Notice & Claims Process Checklist & Plain Language Guide* 3 (2010).

The multipart Notice plan approved by the Court in this case has been implemented by Court-approved settlement administrator Heffler Claims Group, LLC and ComEd, and included:

- direct notice by e-mail to 564,882 Settlement Class members (Radetich Decl. ¶ 10);

- direct notice by postcard 405,966 Settlement Class members (*id.* ¶¶ 5, 13)[4];

- direct notice via bill inserts to approximately 891,000 Settlement Class members who are current customers of ComEd (*id.* ¶ 6);

- the establishment of a settlement website that provided the notice, important Court documents, and the ability to download and file claim forms online (*id.* ¶ 9);

- The maintenance of a toll-free telephone number where Settlement Class members could request a claim form and obtain more information about the Settlement (*id.* ¶ 7); and

---

[4]    Following preliminary approval, the Settlement Administrator determined that, due to the timing of when ComEd sends out bills to certain segments of its customers, notice via bill insert was not feasible for a segment of Settlement Class members who are current ComEd customers because the bills wouldn't have gone out in time.  Accordingly, the Parties agreed that those Settlement Class members would receive Notice by postcard, rather than bill insert, which is obviously, just as good of notice. (*See* Radetich Decl. ¶ 6.)

- notice to the U.S. Attorney General and the State Attorneys General of 50 states as required by CAFA (*id.* ¶ 3).

As a result of the notice provisions of the Settlement, (i.e., e-mail, postcard, and bill insert), direct notice was disseminated to approximately 93% of the Settlement Class.[5] (*Id.* ¶ 13.)

Given that the Settlement Administrator fully implemented the Court-approved Notice plan and at least 93% of the Settlement Class received direct notice of the Settlement, there is no question that Rule 23's notice requirements and due process have been satisfied. *See, e.g.*, *Bickel v. Sheriff of Whitley Cnty.*, 2015 WL 1402018, at *3 (N.D. Ind. Mar. 26, 2015) (finding notice sufficient where direct notice is provided to at least 70% of the settlement class); *Schulte*, 805 F. Supp. 2d at 595–96 (finding notice sufficient where professional settlement administrator provided direct notice to 89.7% of the class, created a settlement website, and maintained a toll-free number that class members could call with questions).

## V.     THE SETTLEMENT WARRANTS FINAL APPROVAL.

Federal Rule of Civil Procedure 23(e) mandates that "claims, issues, or defenses of a certified class may be settled . . . only with the court's approval . . . after a hearing and finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e); *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, 2012 WL 651727, at *1 (N.D. Ill. Feb. 28 2012), *appeal dismissed*, *Safeco Ins. Co. of Am. v. Am. Int'l Grp.*, 710 F.3d 754 (7th Cir. 2013). Even so, "[f]ederal courts naturally favor the settlement of class action litigation." *Schulte*, 805 F. Supp. 2d at 578 (citing *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996)). Given this predisposition towards settlement, the Court's approval inquiry "is limited to [consideration of] whether the proposed settlement is

---

[5]     As set forth in Plaintiff's preliminary approval papers, the size of the Settlement Class is approximately 1.2 million individuals. (*see* dkt. 55-2 ¶ 13.) Nevertheless, the Parties were intentionally overinclusive with respect to notice, and thus, Notice was sent to approximately 1.4 million potential Settlement Class members. The Settlement Administrator's estimate that Notice reached 93% of the Settlement Class is based on this 1.4 million figure.

lawful, fair, reasonable and adequate." *Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 986 (7th Cir. 2002).

The Seventh Circuit has identified five factors for district courts to consider in determining whether to approve a class action settlement: (i) the strength of plaintiff's case compared to the amount of defendant's settlement offer; (ii) an assessment of the likely complexity, length and expense of the litigation; (iii) an evaluation of the amount of opposition to the settlement among affected parties; (iv) the opinion of competent counsel; and (v) the stage of the proceedings and amount of discovery completed at the time of settlement. *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (internal citations omitted); *accord In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 958 (N.D. Ill. 2011) ("*In re AT&T II.*"). In addition to these factors, courts in this Circuit also should also consider whether the settlement is the product of collusion, or whether there are any "red flags" present in the settlement that would suggest a settlement is unfair to settling class members. *Eubank v. Pella Corp.*, 753 F.3d 718, 723-29 (7th Cir. 2014). As explained below, these factors overwhelmingly weigh in favor of approving the Settlement in this case.

### A. The Value of this Settlement in Light of the Risks of Continuing the Litigation Favors Final Approval.

"The most important factor relevant to the fairness of a class action settlement is the first one listed: the strength of plaintiff['s] case on the merits balanced against the amount offered in the settlement." *In re AT&T II*, 789 F. Supp. 2d at 958 (quoting *Synfuel*, 463 F.3d at 653). The strength of a plaintiff's case can be quantified by examining "the net expected value of continued litigation to the class" and then estimating "the range of possible outcomes and ascrib[ing] a probability to each point on the range." *Am. Int'l Grp., Inc.*, 2012 WL 651727, at *2 (quoting *Synfuel*, 463 F.3d at 653); *see also Eubank*, 753 F.3d at 727 (finding that the district court should

"estimate the likely outcome of a trial in order to evaluate the adequacy of the settlement"). However, "the Seventh Circuit recognizes that a high degree of precision cannot be expected in these calculations" and "[i]nstead, courts are to provide a ballpark valuation of the class's claims." *Am. Int'l Grp., Inc.*, 2012 WL 651727, at *2 (internal quotations omitted). Ultimately, because a settlement is a compromise, "courts should not reject a settlement solely because it does not provide a complete victory to the plaintiffs." *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 347 (N.D. Ill. 2010) (hereinafter "*AT&T I*") (quoting *Isby,* 75 F.3d at 1200) (internal quotations omitted).

<b>1. This case presented numerous risks that made recovery on behalf of the class uncertain</b>

A valuation of Plaintiff's claims necessarily entails an analysis of the strengths of Plaintiff's case. *AT&T I*, 270 F.R.D. at 347 ("an integral part of the strength of a case on the merits is a consideration of the various risks and costs that accompany continuation of the litigation."). Plaintiff had great confidence in the merit of his TCPA claim and believes that he would have prevailed at summary judgment or trial. Indeed, the elements of the claim (i.e., that ComEd sent text messages to the Class with an autodialer) could not seriously be disputed. And, as for ComEd's defenses—that the Settlement Class members consented to receive the Text Messages and that ComEd was exempt from liability pursuant to the TCPA's emergency purpose exception—Plaintiff believed he would prevail on those as well.

With respect to the consent defense, ComEd's position is that each Settlement Class member consented to receive the Text Messages when they voluntarily provided ComEd with their cellular phone numbers at the time they established service. (Dkt. 15.) However, the FCC, which is the agency charged with the duty of interpreting the TCPA and implementing rules and regulations in furtherance thereof, has rejected that view of consent and ruled the provision of a

cell phone number for one purpose does not constitute consent to be called (or texted) for all purposes. *See In re GroupMe, Inc./Skype Communications S.A.R.L Petition for Expedited Declaratory Ruling, Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, Declaratory Ruling, 29 FCC Rcd. 3442, at ¶ 12 (Mar. 27, 2014). District courts are bound by the FCC's interpretation of the prior express consent requirement, (*See* the Administrative Orders Review Act, 28 U.S.C. § 2342(1)), and numerous federal courts—not only in this District, but also across the country—have followed the FCC's guidance. *See Kolinek v. Walgreen Co.*, 2014 WL 3056813, at *4 (N.D. Ill. July 7, 2014) (holding that "the scope of a consumer's consent depends on its context and the purpose for which it is given[]" and "[c]onsent for one purpose does not equate to consent for all purposes"); *Zeidel v. YM LLC USA*, 2015 WL 1910456, at *3 (N.D. Ill. Apr. 27, 2015) (same); *see also Aderhold v. Car2go N.A., LLC*, 2014 WL 794802, at *8 (W.D. Wash. Feb. 27, 2014) (following other courts in holding that a consumer only consents to receive text messages that are "closely related to the circumstances under which the plaintiff provided his cell phone number.") (internal citation and quotation omitted).

Nevertheless, some courts have held that simply providing one's phone number to the caller constitutes prior express consent to be called. *Greene v. DirecTV*, 2010 WL 4628734, at *3 (N.D. Ill. Nov. 8, 2010); *Roberts v. Paypal, Inc.*, 2013 WL 2384242, at *5 (N.D. Cal. May 30, 2013); *Ryabyshchuck v. Citibank (S.D.) N.A.*, 2012 WL 5379143, at *3 (S.D. Cal. Oct. 30, 2012); *Baird v. Sabre, Inc.*, 995 F. Supp. 2d 1100, 1106 (C.D. Cal. 2014). Thus, while Plaintiff is confident that he and the Class would have prevailed on their TCPA claim, the above rulings that went the other way on the consent issue demonstrate that he certainly faced risks in the litigation. (Edelson Decl. ¶¶ 13-14.)

ComEd's other defense—that the Text Messages fell under the TCPA's emergency

purpose exception—illustrates the point as well. To be clear, the Text Message on its face did not alert the Class of an emergency. (Dkt. 1, ¶ 21.) Instead, it was an introductory text message arguably apprising them of the fact they would receive future emergency messages. Thus, ComEd would have been hard pressed to argue that the Text Message was a covered message regarding an emergency. Notwithstanding, the question of whether the Text Message falls within the "emergency purpose" exception is undoubtedly an issue of first impression. Indeed, the only other case Plaintiff is aware of that involved this issue is pending before Judge Kennelly in the case captioned *Kolinek v. Walgreens, Inc.*, No. 13-cv-04806 (N.D. Ill. Apr. 3, 2015), and the case recently settled and is awaiting final approval. Any time a litigant, like the Plaintiff here, faces an issue of first impression, there is risk to the case.

In the face of these substantial uncertainties, the Settlement provides real and immediate cash relief—entitling each claiming Settlement Class Member to between 40% and 50% of their statutory damages, which is a much higher percentage than what is typically recovered in other TCPA settlements.[6] And perhaps as importantly, the Settlement provides meaningful prospective relief, which include new procedures to ensure that ComEd's employees tasked with communicating with customers are trained in TCPA compliance.

Thus, given the substantial risks, expense, and delay that would accompany further litigation, and in comparison to other TCPA class action settlements (as discussed below), the Settlement offers substantial value relative to the strength of the Plaintiff's case. The first—and most important—*Synfuel* factor therefore strongly supports final approval.

---

[6]    The TCPA does allow for the possibility of treble damages upon a showing of willfulness. 47 U.S.C. § 227(b)(3). Plaintiff believes, given the facts of this case, such damages were exceedingly unlikely.

## 2. In light of the risks attendant to this litigation, the relief provided to the Settlement Class is substantial

Given the legal uncertainties still facing Plaintiff at the time of settlement, Plaintiff views the $4.95 million non-reversionary Settlement Fund—with the estimated $210 per claimant cash payout—as well as the prospective relief offered by the Settlement, to be an incredible result for the Settlement Class. The amount offered by the Settlement is consistent with (and will most likely be better than) settlements in similar TCPA cases. In "direct relationship" TCPA cases, such as this, where the person called voluntarily provided their telephone number to the caller, settlements have generally provided low-value coupons or less than $25 in cash to each claiming class member. *See, e.g., In re Capital One*, 2015 WL 605203, at *3 (providing $34.60 per claiming class member); *Kazemi*, No. 09-cv-5142, Dkt. 94 (providing for a $25 voucher to each claiming class member); *In re Jiffy Lube Int'l, Inc. Text Spam Litig.*, No. 11-md-2261, Dkt. 97 (S.D. Cal. 2013) (providing for a $20 voucher to each claiming class member, which could be redeemed for $15 cash after nine month waiting period).

Moreover, the expected payout of $200 to $250 per claiming Settlement Class Member is greater than the recovery in so-called "spam" text message settlements (when there is no prior relationship between the defendant and the class member), which often yield far higher cash payouts to the classes than in "direct relationship" cases (given the absence of any relationship between the caller and the called party and, by extension, the clear absence of consent). *See, e.g., Kramer*, No. 10-cv-2722, Dkt. 148 (providing for a cash payment of $100 to each class member); *Weinstein*, No. 06-cv-00484, Dkt. 93 (providing for a cash payment of $150 to each class member); *Lozano*, No. 09-cv-6344, Dkt. 65 (providing for a cash payment of $200 to each class member).

By entering into settlement now on favorable terms to the Settlement Class, Plaintiff has

locked in his gains and hedged against the risks related to the merits of his claim. Weighed against the legal uncertainties facing the Plaintiff, the sizeable amount offered by the Settlement offers substantial value relative to the strength of Plaintiff's case; indeed, compared to the amounts offered by other similar TCPA class action settlements, the Settlement represents not just an adequate recovery, but an excellent recovery. Therefore, the first *Synfuel* factor strongly supports final approval.

**B.**     **The Likelihood of an Increase in the Complexity, Length, and Expense of Continued Litigation Validates Final Approval of the Settlement.**

Final approval is also favored in cases such as this where "[s]ettlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation." *Schulte*, 805 F. Supp. 2d at 586. Although Plaintiff prevailed at the motion to dismiss stage, (dkt. 21), continuing the litigation would have resulted in complex, costly, and lengthy proceedings before this Court and likely the Seventh Circuit, which would have significantly delayed any relief to class members (at best), and might have resulted in no relief to class members at all.

If final approval is not granted and this litigation resumes, the Parties will file their cross-motions for summary judgment and begin briefing on class certification. Defendant will undoubtedly oppose Plaintiff's motion for class certification and appeal any decision in Plaintiff's favor. In fact, regardless of the decision on class certification, the losing party will certainly appeal under Rule 23(f). Assuming certification were granted, if neither party is able to obtain complete victory at the summary judgment phase, the case will be headed for an expensive and high-stakes trial. Put simply, to prosecute his claim to a final judgment, Plaintiff would have had to engage in a round of class certification motion practice, survive a round of summary judgment motion practice, prepare for trial, and present evidence during a jury trial that could last weeks. Aside from the time and delay these additional stages of litigation would have

involved, the costs associated with these litigation activities would have been significant. *See In re AT&T II*, 789 F. Supp. 2d at 964 (recognizing that where a complex class action survives the summary judgment stage, it leads to a "lengthy and expensive" trial). If anything, "this drawn-out, complex, and costly litigation process . . . would provide [Settlement] Class [m]embers with either no in-court recovery or some recovery many years from now." *In re AT&T II*, 789 F. Supp. 2d at 964. The proposed Settlement, in contrast, avoids this long and uncertain path, and instead provides immediate and guaranteed relief to the Settlement Class.

Because the Settlement avoids protracted, costly, and complex litigation, the second *Synfuel* factor also weighs in favor of final approval.

### C. The Complete Lack of Opposition to the Settlement Weighs in Favor of Final Approval.

Next, the Court should consider the fact that there is no opposition to the Settlement to be "strong circumstantial evidence favoring settlement." *See In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1020–21 (N.D. Ill. 2000) (finding that a settlement where "99.9% of class members have neither opted out nor filed objections . . . is strong circumstantial evidence in favor of the settlements"); *In re AT&T II*, 789 F. Supp. 2d 965 (an exclusion or objection rate of 0.01% of class members was "remarkably low" and supported the settlement).

Again, out of the approximately 1.2 million Settlement Class members, only 4 have requested to be excluded (≈.0000025%), (Radetch Decl. ¶ 14), and no Settlement Class member has raised objections—this lack of resistance to the Settlement strongly favors final approval. *See Goldsmith v. Tech. Solutions, Co.*, 1995 WL 17009594, at *5 (N.D. Ill. Oct. 10, 1995) ("not a single objection to the proposed settlement has been received from any class member. Such a positive response to the settlement by the class is strong evidence the settlement is fair, reasonable and adequate, and should be approved.") (internal citations omitted.); *Myszka v.*

*National Collegiate Scouting Ass'n, Inc.*, 2014 WL 1364468, at *1 (N.D. Ill. Mar. 19, 2014) (finding that the complete lack of objections to the settlement supports final approval); *Aboudi v. T-Mobile USA, Inc.*, 2015 WL 4923602, at *6 (S.D. Cal. Aug. 18, 2015) ("The reaction of Class Members can be characterized as positive. No objections have been filed, and there have been only 2 requests for exclusion.").

In short, the complete lack of objections and low exclusion request rate weighs heavily in favor of final approval.

### D.     The Opinion of Competent Counsel Favors Approval.

The next factor considered by courts is the opinion of competent counsel regarding the fairness, reasonableness and adequacy of the Settlement. *Synfuel*, 463 F.3d at 653; *see also Schulte*, 805 F. Supp. 2d at 586 ("The opinion of competent counsel is relevant to the question whether a settlement is fair, reasonable, and adequate under Rule 23."). This is especially true where class counsel are qualified, where discovery and settlement negotiations are extensive and thorough, and where there is no indication of collusion. *Id.; see also Hispanics United v. Vill. of Addison*, 988 F. Supp. 1130, 1150 n. 6 (N.D. Ill. 1997) (noting that a "strong initial presumption of fairness attaches" where the settlement is "the result of arm's length negotiations," and where plaintiff's counsel are "experienced and have engaged in adequate discovery").

Here, Class Counsel are experienced members of the plaintiffs' bar who have built their practice litigating similarly complex consumer privacy class actions and are capable of assessing the strengths and weaknesses of the Parties' respective positions. *In re Facebook Privacy Litig.*, No. C 10-02389 (N.D. Cal. Dec. 10, 2010) (noting that the attorneys at Edelson PC have been specifically recognized as "pioneers in the electronic privacy class action field, having litigated some of the largest consumer class actions in the country on this issue."); *see also Dunstan v.*

*comScore*, No. 11-cv-5807, Dkts. 186, 369 (N.D. Ill.) (securing adversarial certification of largest ever privacy class comprised of millions of consumers for claims arising under federal privacy statutes, and ultimately achieving a $14 million settlement, which resulted in claiming class members receiving approximately $500 each). And with respect to TCPA class actions in particular, Edelson PC is credited for having "pioneered the application of the TCPA to text-messaging technology," *Ellison v. Steven Madden, Inc.*, No. 11-cv-05935, Dkt. 73 (C.D. Cal. May 7, 2013), and is routinely appointed to serve as class counsel by courts in this District and throughout the country in TCPA class actions. *See Rojas v. Career Education Corp.*, No. 10-cv-05260 (N.D. Ill. 2012) (serving as lead counsel in $20 million text spam settlement); *Lozano*, No. 09-cv-06344 (serving as lead counsel in $16 million text spam settlement); *In re Jiffy Lube Int'l, Inc. Text Spam Litig.*, No. 3:11-MD-02261 (serving as co-lead counsel in $35 million text spam settlement).

In addition to their experience, Class Counsel also engaged in significant discovery in this case that has allowed them an opportunity to accurately judge its strengths and weaknesses. Class Counsel reviewed thousands of documents produced by Defendant and third-parties, conducted four depositions, and participated in two arms'-length mediation sessions with the Honorable Wayne Andersen (Ret.) at JAMS. (Edelson Decl. ¶ 17.) This discovery process and the two mediations have allowed Class Counsel to accurately gauge the strengths and weaknesses of Plaintiff's claims and ComEd's potential defenses. (*Id.* ¶ 18.) Given all this, Class Counsel believes that the Settlement provides the best result for Settlement Class members, as it provides real, immediate and substantial cash relief to Settlement Class members, who may otherwise be left without a remedy should ComEd prevail on any of its affirmative defenses. (*Id.* ¶ 19.) Thus, the opinion of Class Counsel favors final approval.

**E.      The Stage of the Proceedings and Amount of Discovery Completed Weigh in Favor of Final Approval.**

The final *Synfuel* factor considers the stage of the proceedings and amount of discovery completed at the time the settlement is reached. *Synfuel*, 463 F.3d at 653. This factor is satisfied where "discovery and investigation conducted by class counsel prior to entering into settlement negotiations was extensive and thorough," *Isby*, 75 F.3d at 1200. The case's procedural posture is significant because "it indicates how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." *Am. Int'l Grp., Inc.*, 2011 WL 3290302, at *8 (citing *Armstrong v. Bd. of Sch. Directors of Milwaukee*, 616 F.2d 305, 325 (7th Cir. 1980) *overruled on other grounds by* 134 F.3d 873). This case's procedural posture—namely, that the Parties vigorously litigated for well over a year prior to the final mediation, and were on the brink of dispositive motion briefing—further supports final approval.

Here, after filing suit and defeating Defendant's motion to dismiss, the Parties engaged in, and in fact completed, six months of class and merits discovery prior to entering into this Settlement. During fact discovery, the Parties exchanged thousands of documents —which Class Counsel personally reviewed and analyzed—containing information related to, *inter alia*, how Defendant had obtained customers' telephone numbers, how any alleged consent to receive text messages had been obtained, how the Text Messages were sent, and how Defendant maintained records of both the phone numbers and any consent to be contacted. (Edelson Decl. ¶ 8.)

Plaintiff also deposed three separate Rule 30(b)(6) corporate representatives designated by ComEd in order to obtain additional discovery related to, *inter alia*, the creation and implementation of the Outage Alert program, the purpose for which the program was created, the manner in which Defendant advertised the program and urged its customers to opt in, Defendant's decision to automatically enroll its customers into the program, the drafting and

design of the content of the Text Message, the equipment and technology used to transmit the Text Message to Plaintiff and the class, the business relationship between Defendant and Agent511 (Defendant's vendor that assisted in the implementation and transmission of the Text Message), and Defendant's policies and procedures relating to compliance with the TCPA. (Edelson Decl. ¶¶ 8, 9.)

Plaintiff also served third-party discovery on several entities, including Agent511, mBlox, Inc., the vendor that physically transmitted the text messages, and Neustar, Inc., the company that licenses shortcodes in the United States. (Edelson Decl. ¶ 9.) Plaintiff reviewed the documents produced by these third-parties, and also took a Rule 30(b)(6) deposition of Agent511's President and corporate designee, Jay Malin. (*Id.* ¶ 9.) This deposition provided important information about the details of the outage alert text message campaign, including the manner in which the recipient telephone numbers were collected and stored, ComEd's decision to auto-enroll its customers into the program, and ComEd's involvement in the creation of the outage alert text messages. (*Id.*)

After this discovery was complete, the Parties proceeded to prepare their cross-motions for summary judgment, and Plaintiff prepared his motion for class certification. (Edelson Decl. ¶ 11.) It was only on the eve of the filing deadlines for these motions did the parties conduct a section mediation session with Judge Andersen and, after engaging in additional arms'-length negotiations with the assistance of Judge Andersen, reach the instant Settlement. (*Id.* ¶ 11.)

Ultimately the extensive discovery completed and the stage of litigation here confirms that Plaintiff and Class Counsel were fully informed of the relevant facts prior to the Settlement. *See Am. Int'l. Group, Inc.*, 2011 WL 3290302, at *8 ("extensive discovery has undisputedly been completed . . . and it is impossible to say that the court and the parties are unable to evaluate the

merits of this case. . . .”). As such, this factor also weighs in favor of final approval.

**F.      The Settlement is not a Product of Collusion and There are No "Red Flags" Present.**

Although not a factor set forth in *Synfuel*, courts in this circuit consider whether the settlement is the product of collusion, or whether there are any "red flags" present in the Settlement that would suggest a settlement is unfair to settling class members. *Eubank*, 753 F.3d at 723-29. Some of the red flags include (i) the failure to properly establish the size of the fund and the total class recovery, (ii) the reversion of unawarded attorneys' fees to the defendant, (iii) substantial alterations to existing class definitions, (iv) the use of coupons, rather than cash payments, for class compensation, and (v) overly complicated claim forms. *See id.* at 723-29. Here, the Court should not hesitate to grant final approval to the Settlement because the Settlement was not the result of collusion, nor does it does not raise any of the "red flags" identified by the Seventh Circuit and other courts in analyzing class settlements,

First, there can be no doubt that this Settlement was not the result of collusion. As described above, the Parties engaged in two separate mediations with Judge Andersen (ret.) of JAMS. The first took place early on in the case and the Parties were unable to reach agreement, and the second occurred months later on the eve of the dispositive motion deadline after the Parties litigated the case. (Edelson Decl. ¶¶ 5, 11.) The timing of the mediations—e.g., that they occurred at the outset of the case and then after the Parties litigated and further developed their claims and defenses—is clear evidence that there was no collusion in the negotiations that ultimately led to the Settlement. *See Butler v. Am. Cable & Tel., LLC*, 2011 WL 2708399, at *8 (N.D. Ill. July 12, 2011) (noting that arm's-length negotiations facilitated by a neutral mediator is a factor that supports a finding that the Settlement was fair.)

Second, none of the "red flags" identified in *Eubank* are present here. First, with respect

to knowledge of the size of the common fund and the amount of recovery to Settlement Class members, the Court here knows exactly how much money will be available to the class under the Settlement: $4,950,000 minus payment for all Settlement Administration Expenses (which are capped at $350,000), an incentive award to the Class Representative (which, subject to Court approval, will be $5,000), and the Fee Award to Class Counsel (which, subject to Court approval, will be $1,650,200) equals $2,944,800. And while the exact *pro rata* recovery available to claiming members of the Settlement Class has not yet been finally determined (since the claims deadline does not expire until October 26, 2015), based on the current and expected rate of claims, Class Counsel estimates that each claimant will recover between approximately $210. Thus, unlike in *Eubank*, the Court knows how much the Settlement Class will recover in the aggregate ($2,944,800), and approximately how much each individual claimant will receive ($210).

The same is true for the remaining concerns identified in *Eubank*. Should the Court decide not to award the full attorneys' fees sought by Class Counsel, the remainder will not revert to Defendant (as it did in *Eubank*), but will remain in the Settlement Fund to be disbursed to claiming members of the Settlement Class. (Settlement ¶ 1.29.) Nor does the Settlement Class definition call into question the propriety of certification as it did in *Eubank*. There, the Seventh Circuit recognized adversity among several certified subclasses, thus rendering the settlement's provision of a single, unified class improper. *Eubank*, 753 F.3d at 721. Here, however, the Settlement Class members' claims are materially indistinguishable from each other—each Settlement Class member received the same Text Message as a part of a uniform program instituted by Defendant. As a result, there are no competing groups within the Settlement Class, and none of the diametrically opposed interests that rendered certification of a single, undivided

class inappropriate in *Eubank* are present here. *See Eubank*, 753 F.3d at 721 (finding "the adversity among subgroups" precluded class certification of one large class for settlement purposes).

And finally, unlike the *Eubank* settlement, which proposed providing only coupon payments to some class members through exceedingly long and difficult claim forms, *id.* at 725, the instant Settlement will provide each claiming class member with a recovery of an estimated $210 through the submission of a simple, one-page claim form submitted either by mail or online. In the end, the complete absence of any red flags further supports final approval.

## CONCLUSION

For the reasons addressed above, Plaintiff Grant respectfully requests that the Court finally approve the Settlement as fair and reasonable.

Respectfully submitted,

**MICHAEL GRANT**, individually and on behalf of the Settlement Class,

Dated: September 8, 2015

By: /s/ John C. Ochoa
One of Plaintiffs' Attorneys

Jay Edelson
jedelson@edelson.com
Rafey S. Balabanian
rbalabanian@edelson.com
Ari J. Scharg
ascharg@edelson.com
John C. Ochoa
jochoa@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Attorneys for Plaintiff and the
Settlement Class*

## <u>CERTIFICATE OF SERVICE</u>

I, John C. Ochoa, an attorney, hereby certify that on September 8, 2015, I served the above and foregoing ***Plaintiff's Motion and Memorandum in Support of Final Approval of Class Action Settlement***, by causing true and accurate copies of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system.

/s/     John C. Ochoa